FANNIE M. JACKSON et al., respondents,

*v.*

CATHERINE JACKSON et al., appellants.

[Decided September 22d, 1922.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"The bill of complaint, in the nature of a bill to quiet title to lands of which Charles Jackson died seized, was filed by Fannie M. Jackson and Charles Jackson, Jr., claiming to be the widow and son respectively of said Charles Jackson, and the defendants are Catherine Jackson and Walter Jackson et al., also claiming to be the widow and sons respectively of said Charles Jackson. The complainant Fannie M. Jackson bases her claim on a 'common law marriage' with Charles Jackson, and the complainant Charles Jackson, Jr., claims as their son. The defendants deny the common law marriage and set up a subsequent ceremonial marriage between Catherine (Hayes) Jackson and base their claim on that marriage.

"Charles Jackson and Fannie M. Jackson (then Fannie Wagner, a widow) met September, 1883, in Brooklyn, N. Y., where they both lived. They were negroes, aged respectively about twenty-eight and twenty-six years. He was a railroad

porter and she was a domestic servant.  He called on her
frequently and in or about June, 1884, he asked her to be
his wife, and she consented, and, subsequently, he fixed some
time in December, 1884, as the date of a wedding.  When
that day arrived she was ready for the wedding; but he told
her that there was trouble about getting a license and they
were not married.  Upon assuring her that 'it would be all
right,' she consented to sexual intercourse with him on that
day.  He remained in Brooklyn until the spring of 1885 and
continued to visit her.  He then went west, remaining away
from her until August, 1886, during which time he failed
to communicate with her (although prior to leaving he had
written her several letters) except once, and that by letter
dated September 11th, 1885, from Chicago, Ill., in which he
offered to send her money and giving his address as the post-
office at Chicago.  He probably knew of the impending birth
of her child, for the complainant Charles Jackson, Jr., was
born September 30th, 1885.  The certificate of this birth
gives her age as twenty-eight, her name as Fannie Wagner
and the father's name as Charlie Jackson.  When Jackson
returned from the west he did not communicate with or visit
her, but in August, 1886, she saw him, by accident, on a
Brooklyn street and ran after him.  She had her baby with
her.  Jackson was still a railroad porter and also operated a
saloon in Jersey City, and the day of that meeting she came
with him to Jersey City, from which place he was to start
on his railroad run.  He then promised to furnish a home
and take her and the child to live in it.  Four or five days
later, upon returning from his run, he came to see her,
promised to get a license and a minister, marry her and fur-
nish a home in which the three should live.  He came to see
her in Brooklyn about once a week from August, 1886, to
December of that year, being still employed on the railroad,
and frequently promised to marry her by a ceremony.  He
told her that he had actually engaged a clergyman but could
not procure a license.  Later he requested her to come to
Jersey City to live with him in a home he would provide for
her and the child and told her he had arranged for a mar-

riage ceremony to be performed at this home on December 22d, 1886. She agreed to come to be married and on that date she gave up her position in Brooklyn as a domestic servant and came to the home he had provided and furnished at 86 Greene street, Jersey City, bringing her child and personal belongings, including a wedding dress, expecting he would marry her; but he failed to keep his promise, telling her there was still trouble over a license. She felt she could not return to Brooklyn because she had given up her employment and had left that city, saying she was to be married and had brought all her belongings with her. Notwithstanding his failure to marry her by ceremony, Jackson assured her 'it would be all right,' and he gave her a wedding ring, which she still wears. They then commenced living together at the Greene street home, apparently as husband and wife, and remained there, maintaining their relation seven or eight years. Her mother (now dead) lived with them five or six years, and Jackson's relatives and friends visited them, and to them he introduced her as his wife. From the time they commenced living together to the present time she has been known by no other name than Jackson. After moving from Greene street they lived together at various places in Jersey City, in homes he provided for her and for which he paid the rent, and he voted from those homes down to 1918. Jackson owned some race horses and frequently attended the races at Saratoga and elsewhere, and she says that except for the time he was absent at the races he spent most of his time with her and their child, eating and sleeping at home with them, down to the time of his death. He purchased the premises in question, a two-family house at 17 Ege avenue, Jersey City, in June, 1918, and shortly thereafter they moved to it and occupied the second floor, and she or her son collected the rent from the tenant of the first floor for Jackson. After coming to Jersey City in 1886 she continually requested him to have a marriage ceremony performed. He always put her off, saying 'it would be all right,' but he never actually refused.

"Jackson was married to Catherine Hayes, a white woman, November 26th, 1893, by a priest of the Roman Catholic Church. Catherine Jackson commenced suit for divorce against Jackson October 5th, 1896, alleging adultery with the complainant Fannie Jackson. The suit was not contested and the complainant therein obtained a final decree for divorce June 7th, 1897, but Jackson continued to visit her and she says they went to a priest of her religious faith to be remarried and that the priest told them they could consider themselves still married, because her church did not recognize the divorce and they thereupon resumed living together. One child was born to them before the divorce and two afterward. Jackson voted from her home, 376 Virginia avenue, Jersey City, in 1918 and 1919, and he died there, suddenly, May 27th, 1920.

"Fannie learned of Jackson's marriage to Catherine and on one occasion went to Catherine's home after him, and, finding him there, took him to her home. She was informed that Catherine had obtained a divorce from Jackson, and thereafter, although she felt she was his wife, she still desired a ceremonial marriage and requested Jackson to marry her; but he again assured her that 'it would be all right,' without giving her a reason for not complying with her wish.

"Before considering the further facts in the case, let us see what the legal situation is. Marriage is a civil contract and no ceremonial is indispensably requisite to its creation. *Voorhees* v. *Voorhees, 46 N. J. Eq. 411, 414; affirmed, 47 N. J. Eq. 315.* Where there is no ceremonial marriage there must be an agreement entered into between the man and the woman, in words of the present tense, to live together as husband and wife. There are probably but few instances of mutual consent, by which each party in precise or unambiguous terms takes the other as spouse; but no particular words are necessary to declare an intention to enter into a contract of marriage. If from what was said by the parties, aided by the circumstances surrounding their entering upon their relationship, it can be gathered that they proposed to enter into a contract thenceforth to live as husband and

wife, it will be sufficient (*Stevens* v. *Stevens, 56 N. J. Eq. 488; Bey* v. *Bey, 83 N. J. Eq. 239; Schaffer* v. *Schaffer, 88 N. J. Eq. 192; affirmed, 89 N. J. Eq. 549*), and where it appears that such relationship is matrimonial, rather than illicit, cohabitation and reputation will justify the presumption that the parties came together under a mutual promise to live as husband and wife. *Voorhees* v. *Voorhees, supra; Wallace's Case, 49 N. J. Eq. 530; Mullaney* v. *Mullaney, 65 N. J. Eq. 384.*

"Certain letters alleged to have been written by Jackson to Fannie were admitted in evidence. She identified them as in Jackson's handwriting, while Catherine denied their authenticity. No other testimony was offered to prove the handwriting, but upon comparing them with Jackson's admitted handwriting, they appear to me to be genuine and I shall so treat them. Nine of these letters, the first of which bears date October 17th, 1883, and the last January 29th, 1885, are addressed to 'My dear Fannie' (or similar words) and are signed 'Your friend (or similar words), Charlie Jackson.' All contain words of love and affection and such expressions as 'I mean business; if you don't love me tell me so, and 'I love but you Fannie; believe me, for some day it will all come true,' and 'I long to see the day come that me and you may be as one,' and 'You said that some day you would like to be my happy little wife. Fannie, I do long to see that day come when I can call you my own,' and 'I do think that you would make a kind little wife,' and 'I shall never be contented until you are my dear little wife,' and 'I know you think that it is horrid to be put off so long, but it is all for the best; some day you will not regret it,' and 'The days that we look forward I am in hopes that they won't appear long to you. I am all preparation that my means will allow me to.' On September 11th, 1885, he wrote her a brief letter: 'Dear Fannie, If you will send me your address I send you some money. Charles Jackson.' This letter is dated about two weeks before her child was born.

"He had intercourse with her in December, 1884, and had left her in the spring of 1885, and she did not see him again until August, 1886. They had not lived together as husband and wife and there is no evidence that prior to her coming to Jersey City in December, 1886, he had spoken of her or introduced her as his wife. He did not address her in his letters as his wife nor sign himself as her husband. Only one envelope accompanying these letters was offered in evidence and that is addressed to 'Mrs. Fannie Wagner.' I cannot find from the evidence that a contract of marriage in words of the present tense was entered into by the parties up to December, 1886, and their child, therefore, was born out of wedlock.

"We come now to the time when she came to Jersey City, December 22d, 1886. We have her testimony as to what transpired between Jackson and herself on that day and during the preceding years and we have the evidence to be gathered from his letters. Several witnesses of their race were produced. Some of them had an acquaintance with Jackson and Fannie covering a period of thirty years prior to his death. One had boarded with them eight or nine years; another had worked for Jackson twenty-five years, part of the time in a saloon over which they lived, and had also boarded with them a month, and another was married from their home in 1896, and thereafter lived in the same house with them over a year. The other witnesses were friends who met the parties frequently. These witnesses cover the life of Jackson and Fannie from the time of their residence on Greene street to his death. They said they knew her as Jackson's wife; that they lived together as husband and wife during that period; that he spoke of Fannie as his wife and as 'Mrs. Jackson' and that they knew her by no other name; that he introduced her to others as his wife; that they and others addressed her as 'Mrs. Jackson' in his presence; that he frequently spoke of the boy as his son and that the boy always called him 'Pop.' Five letters written by Jackson to Fannie when she was away from home on visits were admitted in evidence, four of them being

dated on July and August, 1895, and the fifth in 1899.
Four are addressed 'My dear wife' and the fifth 'My dear
Fannie,' and all are signed 'Your husband, Charlie Jack-
son.' In these letters he writes of matters pertaining to
their home, gives messages for their son and in one he says
he expects her to soon return home. Six envelopes addressed
in his handwriting, four postmarked 1895, to 'Mrs. Charles
Jackson,' and two postmarked 1900, to 'Mrs. Fannie Jack-
son,' are also in evidence. Two invitations to attend wed-
dings, one in October, 1887, and the other in January, 1896,
contained in envelopes addressed 'Mr. and Mrs. C. Jackson,'
were produced by Fannie. The person from whom he pur-
chased the Ege avenue house, June 10th, 1918, testified that
when he bought it he told her he wanted it for his wife and
son. Shortly after he had taken title he moved both com-
plainants to it. On January 14th, 1920, he executed a
mortgage on this property in which 'Charles Jackson and
Fannie M. Jackson, his wife,' were named as the mort-
gagors and Jackson then swore to an affidavit wherein he
stated that Fannie was his wife. He gave the attorney who
prepared the mortgage and the affidavit the facts therein
contained and when he and Fannie executed the mortgage
and he swore to the affidavit he introduced Fannie as his
wife to the attorney and before swearing to the affidavit he
stated to the attorney that he had read it.

"After Jackson's marriage to Catherine he apparently
maintained two homes and divided his time and attentions
between the two women, and to friends and acquaintances
of Fannie and himself she was still known as his wife,
while to friends and neighbors of Catherine and himself
Catherine was known as his wife, which state of affairs
existed up to the time of his death.

"None of the evidence on behalf of Fannie is seriously
controverted. No evidence was offered to show that during
her life with Jackson in Jersey City she was known by any
name other than 'Mrs. Jackson,' except that Catherine says
Jackson told her that complainant's name was Fannie
Williams and that he was boarding with her. The only

evidence tending to show that Jackson did not consider
Fannie his wife relates to the period after his ceremonial
marriage with Catherine in 1893, and consists of the fact
of that marriage; that thereafter he lived with both Fannie
and Catherine; that Catherine was spoken of by him and
was known to certain of their friends and neighbors as his
wife; that in June, 1911, he executed a bond and mortgage
with Catherine wherein he was described as her husband;
that a letter dated August 14th, 1917, addressed 'Dear Kate'
and signed 'C. Jackson' was enclosed in an envelope ad-
dressed by Jackson to 'Mrs. Kate Jackson' and that in 1918
Jackson accepted a deed for the Ege avenue property in
which the grantee is named as 'Charles Jackson, unmarried.'

"It was argued that Fannie's story could not be true; that
Jackson assigned as his reason for failing to have a mar-
riage ceremony with her that he was unable to obtain a
license, because no marriage license was required in New
Jersey in 1886. But while the excuse was not a valid reason
he may nevertheless have offered it and her statement that
he did is uncontradicted.

"Of course, if Jackson entered into a common law mar-
riage with Fannie in 1886, no marriage that he might there-
after contract could affect Fannie's right. Upon considering
all the evidence, I think the complainants have shown that
a contract of marriage in words of the present tense was
entered into between Jackson and Fannie December 22d,
1886, and the reasons for my conclusions are that in the
letters Jackson wrote her prior to 1886 he stated, in effect,
that his attention to her was for an honorable purpose and
that he loved her and wanted her to be his wife, and she
swears that upon his proposal of marriage she agreed to
marry him; that under promise of marriage he betrayed
her and became a father; that when he returned from the
west in August, 1886, and she met him, he could, had such
been her disposition, have maintained illicit relations with
her in Brooklyn, instead of bringing her and his child to
Jersey City, where he then lived and had a business and
friends; that if the only purpose of his prior association

with her had been illicit and he had accomplished that purpose, he would have repudiated her in August, 1886, after having been away from her over a year; that instead of casting her off or attempting meretricious relations with her in Brooklyn, he agreed to do the thing it was his duty to do, when he requested her to come to Jersey City to marry him and live with him in a home which he provided for her and their child; that she came in good faith, bringing a wedding dress; that although he then failed to enter into a ceremonial marriage with her, he did not ask her to remain as his mistress, but as his wife whom he promised to publicly acknowledge by a form of ceremony in the presence of witnesses, so soon as the alleged obstacle could be removed; that he then gave her a symbol of marriage, a wedding ring, and told her 'it would be all right,' which can be construed to mean that if they were both willing to live together as husband and wife, without calling in a clergyman and others to witness their vows, it would be all right in law; that she was not a woman of loose morals and but one act of sexual intercourse is shown to have occurred prior to her coming to Jersey City. Is there anything in her conduct from which it can be said that after coming to Jersey City to be a wife, she remained as a kept woman? She must have been anxious that the father should acknowledge his child and make her his wife, and this desire and the dread of further disgrace can fairly be assigned as her motive for acceding to his solicitations that they live together. If she remained, she was practically assured that he would hold her out to the world as his wife. If she left, she might forever lose the opportunity of being set right before her friends and acquaintances and she had no home to which she could go. She merely waived her desire for a ceremonial marriage and consented to live with him under an agreement as understood by her, that from thenceforward they should be husband and wife. I think the facts demonstrate that the intent of the relationship thus established was matrimonial on both sides and that a binding contract of marriage can be inferred from what was said and done by the parties.

16

"Even if their relation was originally illicit without a contract of marriage, a change to matrimonial relations may be shown and a lawful common law marriage established. The change may be established by proof of circumstances excluding that the original relation continued and showing satisfactorily that it was changed to a matrimonial union by mutual consent. *Robinson* v. *Robinson, 83 N. J. Eq. 150, 156; Bey* v. *Bey, supra; Schaffer* v. *Schaffer, supra.*

"It is argued that the failure of Jackson to marry Fannie on the date originally fixed in December, 1884, his desertion of her for over a year after inducing her to have intercourse with him, his continued postponement of a ceremonial marriage on the pretence that he was unable to procure a marriage license at a time when no such license was required, and his subsequent evasions of her frequent requests for a marriage ceremony, and his marriage to Catherine, all show that it was not his intention to assume the relation of husband to Fannie but rather that he was deceiving her, and that the purpose of inducing her to live with him was illicit on his part, and therefore there could have been no mutual contract of marriage in 1886. In the interest of morality and decency, I prefer to believe that by his words and acts, followed by his consent to matrimonial repute after December 22d, 1886, he meant to enter into a state of matrimony with Fannie, but if he induced her to live with him, by words and acts which amounted to a statement on his part that she was to be his wife, I do not think that she would be deprived of her matrimonial rights by any mental reservation he may have made, or by any secret intention he may have had not to be her husband, but that the law of estoppel could be invoked to prevent the imposition of so gross a fraud on her. *Chamberlain* v. *Chamberlain, 68 N. J. Eq. 414, 423.*

"The evidence clearly shows that after December 22d, 1886, their cohabitation was connubial in character and not occasional, limited or secret; that they lived together openly as husband and wife; that he acknowledged her as his wife and his son, the complainant, as his son, both by word and in writing; that their matrimonial habit and repute was gen-

eral among their friends with whom their daily lives were spent, and that their relation as husband and wife and their matrimonial repute continued even after Jackson's marriage with Catherine. All these facts support the idea that it was their mutual intention to enter into a common law marriage contract.

"I find therefore that on December 22d, 1886, a lawful and binding contract of marriage was entered into between Charles Jackson and the complainant Fannie M. Jackson, which was in force at his death, and that she is his lawful widow and as such is entitled to dower in his estate. I also find that the premises described in the bill of complaint were conveyed to the said Charles Jackson and that he died seized thereof.

"I have said that at the time of the birth of the complainant Charles Jackson, Jr., his parents had not, in my opinion, contracted marriage. Their subsequent marriage and recognition and treatment of him as their child legitimated him, and upon the death of his father, intestate, the said Charles Jackson, Jr., became entitled and seized as heir-at-law to the same share of his father's real estate as he would have received had his parents been married at the time of his birth. *P. L. 1915 p. 333.*"

*Mr. Herbert C. Gilson,* for the respondents.

*Mr. Charles E. S. Simpson,* for the appellants.

PER CURIAM.

The decree order appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Fielder.

*For affirmance* — THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, ACKERSON, VAN BUSKIRK—15.

*For reversal*—None.