689 A.2d 828

RUTGERS COUNCIL OF AAUP CHAPTERS; PROFESSOR WILLIAM E. MAYO; PROFESSOR WILLIAM W. DERBYSHIRE; PROFESSOR LOUIE CREW; PROFESSOR S. SCHURMAN; AND DEAN JAMES D. ANDERSON, PLAINTIFFS–APPELLANTS, v. RUTGERS, THE STATE UNIVERSITY, DEFENDANT, AND DIVISION OF PENSIONS; STATE HEALTH BENEFITS COMMISSION; AND THE DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 20, 1997—Decided March 12, 1997.

Baime, J.A.D., filed concurring opinion.

Paul G. Levy, J.A.D., filed concurring opinion.

———

Before Judges SHEBELL, BAIME and PAUL G. LEVY.

*Denise Reinhardt* argued the cause for appellant, Rutgers Counsel of AAUP Chapters (*Reinhardt & Schachter*, attorneys; *Ms. Reinhardt*, of counsel, and on the joint brief).

*Rosemary DiSavino* argued the cause for appellants, William E. Mayo, William W. Derbyshire, and Louie Crew (*Ball, Livingston & Tykulsker*, attorneys; and on the joint brief).

*Julie Goldscheid* argued the cause for NOW Legal Defense And Education Fund (on the joint brief).

*Lenora Lapidus* appeared for American Civil Liberties Union for appellants, S. Schurman and James D. Anderson (*Balk, Oxfeld, Mandell & Cohen*, attorneys; and on the joint brief).

*Sue Kleinberg*, Deputy Attorney General, argued the cause for respondents (*Peter Verniero*, Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Ms. Kleinberg* and *Eileen Kelly*, Deputy Attorney General, on the brief).

*Christine C. Burgess* and *Suzanne B. Goldberg*, attorneys for Amici Curiae Lambda Legal Defense and Education Fund, Inc., and New Jersey Lesbian & Gay Law Association (*Ms. Burgess*, on the joint brief).

*Zazzali, Zazzali, Fagella & Nowak*, attorneys for Amicus Curiae New Jersey Education Association (*Kathleen A. Naprstek*, on the letter-brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

Plaintiffs, five employees of Rutgers University and their collective bargaining agent, Rutgers Council of AAUP Chapters, appeal the Division of Pensions' denial of health insurance coverage to the employees' same-sex domestic partners. Denial of coverage was based on the failure of the parties to satisfy the statutory definition of "dependents"—that is, they were not "spouses" under New Jersey law.

On appeal plaintiffs makes four points: (1) the language of the State Health Benefits Plan ("SHBP") Act, regulations, case law, and public policy mandate liberal construal of the term "dependents" to protect state employees' families, including their domestic partners; (2) the denial of health benefits to plaintiffs' domestic partners violates the New Jersey Law Against Discrimination ("LAD") by discriminating on the basis of sexual orientation and marital status; and (3) the denial of health benefits to the domestic partners of gay and lesbian state employees violates the employees' rights to equal protection under the New Jersey Constitution; and (4) the SHBP Act must be interpreted in a manner consistent with Executive Order No. 39, which prohibits discrimination in the executive branch on the basis of sexual orientation.

Amici curiae, Lambda Legal Defense and Education Fund, Inc., and the New Jersey Lesbian & Gay Law Association, argue that the denial of benefits violates the LAD prohibition against discrimination on the basis of marital status. As support for their argument, they have provided data on private companies and municipalities that have extended health benefits to their employees' domestic partners, which amici contend demonstrates that neither the cost to employers, nor the administrative burdens of such coverage, are prohibitive.

In April and July 1992 the individual plaintiffs sought to enroll their same-sex domestic partners as dependents in the SHBP. On September 30, 1992, the Director of the Division of Pensions, refused to enroll them on the advice of the Attorney General's

office. Plaintiffs Mayo, Derbyshire, and the AAUP, filed a grievance against Rutgers, alleging discriminatory denial of health benefits coverage. On July 29, 1993, the grievance was denied by Rutgers' Vice President for Administration.

On November 15, 1993, plaintiffs filed a complaint in the Law Division against Rutgers and the State defendants. They alleged violations of the LAD (counts one and two), violation of Executive Order No. 39 (count three), a violation of Rutgers policy (count four), violations of the New Jersey Constitution (counts five and six), and breach of the collective negotiating agreement (count seven). On January 19, 1994, Rutgers filed an answer, and the State defendants answered on February 1, 1994. On November 15, 1994, the State defendants moved to dismiss the complaint. On February 3, 1995, the motion judge ruled that the Director's decision was properly reviewable by the Appellate Division and entered an order transferring the action against the State defendants to this court, pursuant to *R.* 2:2–3(a)(2), and, stayed the action against Rutgers pending disposition by this court. The judge also granted plaintiffs' motion to file an amended complaint. Plaintiffs' subsequent motion to the judge seeking reconsideration of the order transferring the case to this court was denied. On June 28, 1995, plaintiffs additionally filed a Notice of Appeal. Our careful review of the entire record, together with the arguments raised on appeal and pertinent law, satisfies us that relief from this court cannot be afforded.

The five individual plaintiffs are or were professors at Rutgers who, as state employees, qualify for benefits under the SHBP. Each had lived in a long-term, committed relationship with a same-sex domestic partner for between fourteen to twenty-one years, sharing joint ownership of real and personal property and other indicia of financial interrelationship, and in one case raising a child together.

All plaintiffs, except Anderson, who is also a dean, are represented by the AAUP. The collective negotiating agreement between the AAUP and Rutgers prohibits discrimination on the

basis of sexual orientation and marital status, as does Rutgers' internal policy.

In April 1992, plaintiffs Mayo, Derbyshire, Crew, and Anderson applied to enroll their domestic partners in the SHBP. Rutgers sent the applications to the Division of Pensions, asking whether it would extend coverage to them. In August 1992, Rutgers also sent the Division the application of plaintiff Schurman, a newly hired faculty member. The Division referred the matter to the Attorney General's Office for an opinion on whether the term "spouse" covers same-sex domestic partners for the purposes of the SHBP. On September 14, 1992, a Deputy Attorney General rendered an opinion that a same-sex domestic partner cannot be considered an eligible dependent under the SHBP "because he/she is not a spouse under New Jersey law." On September 30, 1992, the Division's Director denied coverage.

On March 3, 1993, Rutgers once again wrote to the Director enclosing information regarding the implementation of the University of Iowa's health benefits plan, which covers same-sex domestic partners. The Director replied that "none of the rules and regulations of the State Health Benefits Program have changed" and that the "answers provided in previous correspondence still stand." Plaintiffs Mayo, Derbyshire, and the AAUP filed a grievance against Rutgers on behalf of themselves and all others similarly situated. The grievance was denied on the ground that the Division administers the SHBP and its interpretation of "dependents" is controlling.

■ It is plaintiffs' position that the statutory term "dependents" should be read to include domestic partners who are the functional equivalent of spouses in order to effectuate the remedial purpose behind the SHBP act. *N.J.S.A.* 52:14–17.26(d) defines "dependents" as:

an employee's spouse and the employee's unmarried children under the age of 23 years who live with the employee in a regular parent-child relationship.

The implementing regulations define "dependents" the same way. *See N.J.A.C.* 17:9–3.1(a). The goal of the SHBP "is to provide

comprehensive health benefits for eligible public employees and their families at tolerable cost," and this court has concomitantly recognized the Legislative goal of providing coverage to employees and their dependents on a broad and equal basis. *Heaton v. State Health Ben. Comm'n,* 264 *N.J.Super.* 141, 151–52, 624 *A.*2d 69 (App.Div.1993); *G.B. v. State Health Ben. Comm'n,* 222 *N.J.Super.* 83, 90, 535 *A.*2d 1010 (App.Div.1988).

When the SHBP law was enacted in 1961, the meaning of the term "spouse" was so clear that Legislative intent is found by merely reading the plain language of the act. It dictates that health coverage may be extended only to legal spouses of state employees or their dependent children under the age of 23 years. *N.J.S.A.* 52:14–17.26(d). We recognize that in recent years, in a variety of contexts, our courts have considered the changing notions of "family" when deciding whether cohabitants, both heterosexual and homosexual, should be treated as dependents or family. *See Adoption of Two Children by H.N.R.,* 285 *N.J.Super.* 1, 666 *A.*2d 535 (App.Div.1995) (same-sex domestic partner of a child's biological mother may adopt child); *see also Dunphy v. Gregor,* 136 *N.J.* 99, 642 *A.*2d 372 (1994) (common law doctrine expanded to allow bystander recovery by a woman who was engaged to and cohabiting with the victim of an auto accident); *Parkinson v. J. & S. Tool Co.,* 64 *N.J.* 159, 313 *A.*2d 609 (1974) (divorced wife qualified as a de facto spouse of decedent because she had resumed cohabiting and asked a priest to remarry them, who refused); *Dawson v. Hatfield Wire & Cable Co.,* 59 *N.J.* 190, 280 *A.*2d 173 (1971) ("dependent" in the Workers' Compensation statute, *N.J.S.A.* 34:15–13(f), expanded to include a de facto wife).

However, in dealing with statutory and contract interpretation, we have not been disposed to expanding plain language to fit more contemporary views of family and intimate relationships. For example, in *Lopez v. Santiago,* 125 *N.J.Super.* 268, 310 *A.*2d 500 (App.Div.1973), we declined to find that an automobile accident victim was the "spouse" of the driver, even though they had four children, lived together and she had taken his name. *Id.* at 269–

70, 310 A.2d 500. Similarly, we declined to find that another automobile accident victim was a "relative" of the insured. *Handler v. State Farm Mut. Auto. Ins.*, 253 *N.J.Super.* 641, 646–47, 602 A.2d 796 (App.Div.1992). In that case, the victim was both the former and future father-in-law of the insured, as she used to be married to his son and was engaged to be married to another son. *Id.* at 643, 602 A.2d 796. Finally, our recent decision in *Shuman v. Market Transition Facility*, 294 *N.J.Super.* 193, 682 A.2d 1225 (App.Div.1996) is consistent with earlier cases, as we again refused to expand the traditional notions of family for contract purposes. *Shuman, supra,* involved an application for automobile insurance coverage for the insured's unmarried co-habitant. *Id.* at 194, 682 A.2d 1225. Because we found that the insured unmarried co-habitant was not a "family member," we affirmed the denial of coverage. *Id.* at 195–96, 682 A.2d 1225.

Plaintiffs acknowledge the plain language definitions under the SHBP Act, but nonetheless contend that by refusing to extend health benefits, a form of compensation, to their domestic partners, defendants violate LAD's prohibition against discrimination on the basis of marital status and sexual orientation. The LAD prohibits an employer from discriminating against an employee "in compensation or in terms, conditions or privileges of employment" because of marital status or sexual orientation. *N.J.S.A.* 10:5–12. Our courts have held that health insurance and pension benefits are compensatory in nature. *Gauer v. Essex County Div. of Welfare*, 108 *N.J.* 140, 149, 528 A.2d 1 (1987); *Weiner v. County of Essex*, 262 *N.J.Super.* 270, 286, 620 A.2d 1071 (Law Div.1992).

The LAD, however, provides several exceptions limiting its scope, one of which covers state employee benefit programs:

Nothing contained in this act … shall be construed … *to interfere with the operation of the terms or conditions and administration of any bona fide retirement, pension, employee benefit or insurance plan or program,* including any State or locally administered public retirement system, provided that the provisions of those plans or programs are not used to establish an age for mandatory retirement.

[*N.J.S.A.* 10:5–2.1 (emphasis added).]

We have held that this exception applied to bar a claim that statutory provisions terminating pension rights upon remarriage violated the LAD. *Chausmer v. Comm'rs Emp. Retire. Syst. Newark,* 150 *N.J.Super.* 379, 382, 375 *A.*2d 1205 (App.Div.1977).

The LAD's unambiguous exception for benefit and insurance programs bars plaintiffs' claim that the LAD precludes the alleged discriminatory effect of the SHBP. The 1961 adoption of the statutory definition of "dependents" was followed by the adoption of the LAD's prohibitions against discrimination based on marital status or sexual orientation. In such a situation, the rules of statutory construction might call for the more recent of the legislative pronouncements to prevail. 2B *Sutherland Statutory Construction* § 51.02 (1992 ed.). However, because the statutory exception to the LAD was part of the later enactment and was intended to place programs such as the SHBP outside the scope of the LAD, the LAD is unavailable to plaintiffs' cause.

Consistent with that view, a California court, in *Hinman v. Dep't of Personnel Administration,* 167 *Cal.App.*3d 516, 213 *Cal. Rptr.* 410, 418–19 (1985), held that a similar exception to California's employment discrimination statute applied to the state's dental benefits plan. It said that the plan qualified as "bona fide" because it adopted its definition of "family member" before the discrimination statute added the marital status category, thus entitling the plan to a presumption of validity. *Id.* 213 *Cal.Rptr.* at 419 (citing *United Air Lines, Inc. v. McMann,* 434 *U.S.* 192, 202–03, 98 *S.Ct.* 444, 449–50, 54 *L.Ed.*2d 402, 412–13 (1977)). In *Phillips v. Wisconsin Personnel Comm'n,* 167 *Wis.*2d 205, 482 *N.W.*2d 121, 125–26 (App.1992), the Wisconsin court reconciled two seemingly inconsistent statutes, one defining "dependents" for health insurance purposes and the other relating to employment discrimination, by concluding that the Legislature could not have intended to violate its civil rights statute when it statutorily defined "dependents" because the amendment prohibiting marital status discrimination and the statutory definition of "dependents" had been enacted at the same time.

Plaintiffs also contend that the denial of health benefits to their domestic partners violates their right to equal protection under the New Jersey Constitution because there is no rational relationship between the classification based on marital status and the governmental interest that it serves. We disagree.

Article I, paragraph 1 of the New Jersey Constitution, like the Fourteenth Amendment of the United States Constitution, protects "against the unequal treatment of those who should be treated alike." *Greenberg v. Kimmelman*, 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985). In analyzing equal protection challenges, New Jersey courts have rejected the rigid, multi-tiered approach followed by the federal courts, instead relying on a flexible balancing test. *Barone v. Dep't of Human Services*, 107 *N.J.* 355, 368, 526 *A.*2d 1055 (1987). The crucial issue under New Jersey case law is " 'whether there is an appropriate governmental interest suitably furthered by the differential treatment' " involved. *Borough of Collingswood v. Ringgold*, 66 *N.J.* 350, 370, 331 *A.*2d 262 (1975) (citation omitted), *appeal dismissed*, 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L. Ed.*2d 826 (1976). Three factors considered under this balancing test are "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg, supra*, 99 *N.J.* at 567, 494 *A.*2d 294. Our equal protection analysis requires " 'a real and substantial relationship between the classification and the governmental purpose which it purportedly serves.' " *Barone, supra*, 107 *N.J.* at 368, 526 *A.*2d 1055 (quoting *Taxpayers Ass'n of Weymouth Township v. Weymouth Township*, 80 *N.J.* 6, 43, 364 *A.*2d 1016 (1976), *cert. denied sub nom. Feldman v. Weymouth*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L. Ed.*2d 373 (1977)).

In New Jersey when a statute is facially neutral, as here, even if it has a disparate impact on a class of individuals, an equal protection challenge based on the New Jersey Constitution will succeed only if the Legislature intended to discriminate against the class. *Greenberg, supra*, 99 *N.J.* at 580, 494 *A.*2d 294. In that case, the Court found that the Legislature did not intend to

discriminate against women when enacting a casino ethics amendment that prohibited spouses of judges, most of whom are women, from working in the casino industry. *Id.* at 579–80, 494 *A.*2d 294. The Court in *Greenberg, supra,* relied in part upon *Massachusetts v. Feeney,* 442 *U.S.* 256, 99 *S.Ct.* 2282, 60 *L. Ed.*2d 870 (1979), where the United States Supreme Court held that a veteran-preference statute did not violate the Equal Protection Clause despite its disparate impact on women because there was no showing of a discriminatory legislative purpose. *Id.* at 274–75, 99 *S.Ct.* at 2293–94, 60 *L.Ed.*2d at 870. In this case, plaintiffs cannot show a discriminatory intent behind the marital status classification and, therefore, cannot succeed in their equal protection challenge. *See Greenberg, supra,* 99 *N.J.* at 580, 494 *A.*2d 294; *see also Feeney, supra,* 442 *U.S.* 256, 99 *S.Ct.* 2282, 60 *L.Ed.*2d 870.

New Jersey courts will examine a classification closely if it discriminates on an invidious basis—that is, if the class is "suspect." *Robinson v. Cahill,* 62 *N.J.* 473, 491, 303 *A.*2d 273, *cert. denied sub nom., Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973). Our courts have held gender-based classifications to be suspect, *Tomarchio v. Township of Greenwich,* 75 *N.J.* 62, 69, 379 *A.*2d 848 (1977) (holding that proof of dependency requirements imposed on widowers but not widows violated the equal protection guarantee), but have not addressed classifications based on marital status or sexual orientation. However, the federal courts have held that sexual orientation classifications are not suspect. *Ben–Shalom v. Marsh,* 881 *F.*2d 454, 465–66 (7th Cir.1989) *cert. denied,* 494 *U.S.* 1004, 110 *S.Ct.* 1296, 108 *L.Ed.*2d 473 (1990); *High Tech Gays v. Defense Indus. Sec. Clearance Off.,* 895 *F.*2d 563, 573–74 (9th Cir.1990). We have not created suspect classifications where the federal courts have refused to do so, and therefore, have no reason to view sexual orientation or marital status as deserving of heightened scrutiny.

Therefore, our analysis of equal protection turns on whether there was a "real and substantial relationship" between the differ-

ential treatment based on marital status and the State's articulated interest in the classification. *Barone, supra,* 107 *N.J.* at 368, 526 *A.*2d 1055. Our analysis entails a balancing of the "nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg, supra,* 99 *N.J.* at 567, 494 *A.*2d 294.

The State contends that its policy of extending health benefits to employees' spouses rather than domestic partners furthers the governmental goal of creating a workable administrative scheme that can be applied in a uniform and objective manner. In *Barone, supra,* where a definition of "disabled" for the purpose of one act was contingent on an individual's eligibility for disability benefits under another act, the Court considered valid the government's interest in simplifying disability determinations so as to maximize the benefits available to applicants. 107 *N.J.* at 371–72, 526 *A.*2d 1055. Likewise, in *Hinman, supra,* the court held that the statutory definition of "family member" was a reasonable means of administering the dental benefits program. 213 *Cal. Rptr.* at 417.

Balancing the parties' and the public's interest in the marital status classification causes us to conclude that the State's interest should prevail. The importance of affordable health insurance to employees' families cannot be denied and this is a stated purpose behind the SHBP Act. Further, the State's interest in objective determinations of eligibility for coverage is entitled to recognition by the court. The present classification avoids the State getting involved in a subjective analysis, and avoids that certain conflict that would arise from establishing and analyzing subjective criteria.

Nonetheless, we choose to discuss two aspects of the statutory requirement that domestic partners must be married in order to qualify for benefits. Regarding heterosexual domestic partners, an elementary response is that marriage solves the problem and that the health benefits afforded by the SHBP serve to indemnify the employee's obligation to provide the spouse with

medical care and necessities imposed by the marriage law. Homosexual domestic partners, however, point out that they may not enter into a lawful marriage and, therefore, they as lesbian and gay male citizens are not afforded equal protection. Although plaintiffs have indicated that their attack here is not directed against the marriage statute, we believe some discussion of restrictive laws is warranted.

No specific language in New Jersey's marriage statutes prohibits same-sex marriages. *N.J.S.A.* 37:1–1 entitled "Certain Marriages Prohibited" prohibits "a man" or "a woman" from marrying any of their "ancestors or descendants" or other specifically delineated relative: siblings, nieces and nephews, aunts or uncles. The statute which requires a marriage license speaks in gender-neutral language: "the persons intending to be married shall obtain a marriage license." *N.J.S.A.* 37:1–2. The statute requiring parental consent for marriage has, since 1991, used the term "minor" after an amendment deleted reference to underage males and females. *N.J.S.A.* 37:1–6. However, the provision that describes where the marriage license is to be obtained refers to the residential municipality of "the female party to the proposed marriage;" or, "if the female party is a nonresident of this state" the municipality in which "the male party resides." *N.J.S.A.* 37:1–3(a), (b).

*M.T. v. J.T.*, 140 *N.J.Super.* 77, 355 *A.*2d 204 (App.Div.), *certif. denied,* 71 *N.J.* 345, 364 *A.*2d 1076 (1976), is the only reported decision in this State which addresses the question of same-sex marriages. There, defendant husband defended plaintiff wife's complaint for support on the ground that wife was a male and the marriage was therefore void. *Id.* at 78–79, 355 *A.*2d 204. The plaintiff had been born a male, but through surgery and hormonal therapy, she became a female. *Id.* at 79–81, 355 *A.*2d 204. Although the parties were married a year after the surgery, *id.* at 79, 355 *A.*2d 204, defendant contended that at that time plaintiff was a male and therefore the marriage was a nullity. *Id.* at 83,

355 *A*.2d 204. Then Judge, now Justice, Handler discussed who may enter into a valid marriage in this State. He wrote:

> We accept—and it is not disputed—as the fundamental premise in this case that a lawful marriage requires the performance of a ceremonial marriage of two persons of the opposite sex, a male and a female. Despite winds of change, this understanding of a valid marriage is almost universal. Annotation, *"Marriage Between Persons of Same Sex,"* 63 *A.L.R.*3d 1199 (1975). In the matrimonial field the heterosexual union is usually regarded as the only one entitled to legal recognition and public sanction. 52 *Am.Jur.*2d, Marriage, § 1 at 865; *e.g. Singer v. Hara,* 11 *Wash.App.* 247, 522 *P.*2d 1187 (App.Ct.1974); *B. v. B.,* 78 *Misc.*2d 112, 355 *N.Y.S.*2d 712 (Sup.Ct.1974); *Jones v. Hallahan,* 501 *S.W.*2d 588 (Ky.Ct.App. 1973); *Baker v. Nelson,* 291 *Minn.* 310, 191 *N.W.*2d 185 (Sup.Ct.1971), *app. dism.* 409 *U.S.* 810, 93 *S.Ct.* 37, 34 *L.Ed.*2d 65 (1972).
>
> There is not the slightest doubt that New Jersey follows the overwhelming authority. The historic assumption in the application of common law and statutory strictures relating to marriages is that only persons who can become "man and wife" have the capacity to enter marriage. *Cf. Winn v. Wiggins,* 47 *N.J.Super.* 215, 220, 135 *A.*2d 673 (App.Div.1957); *Jackson v. Jackson,* 94 *N.J. Eq.* 233, 236–237[118 A. 926] (E. & A.1922); *N.J.S.A.* 37:1–10. The pertinent statutes relating to marriages and married persons do not contain any explicit references to a requirement that marriage must be between a man and a woman. *N.J.S.A.* 37:1–1 *et seq.; N.J.S.A.* 2A:34–1 *et seq.* Nevertheless that statutory condition must be extrapolated. It is so strongly and firmly implied from a full reading of the statutes that a different legislative intent, one which would sanction a marriage between persons of the same sex, cannot be fathomed.
>
> [*Id.* at 83–85, 355 *A.*2d 204 (footnote omitted).]

The court ultimately affirmed the lower court's determination that the plaintiff was in fact a female, that the marriage was valid and that the defendant was required to pay support. *Id.* at 90, 355 *A.*2d 204.

A great number of jurisdictions have expressly forbidden same-sex marriages or expressly limited marriages to heterosexual couples, but we find only five jurisdictions that have had challenges to these limitations on constitutional grounds. Other courts have dealt with the issue of same-sex marriages, but marriage statutes and the interpretation thereof were not involved. *See Adams v. Howerton,* 673 *F.*2d 1036 (9th Cir.1982), *cert. denied,* 458 *U.S.* 1111, 102 *S.Ct.* 3494, 73 *L.Ed.*2d 1373 (1982) (challenge to section of Immigration and Nationality Act defining spouse as excluding homosexual marriage partner); *DeSanto v. Barnsley,* 328 *Pa.Super.* 181, 476 *A.*2d 952 (1984) (action for

divorce between two males where the complainant claimed a valid common law marriage existed); *Koppelman v. O'Keeffe,* 140 *Misc.*2d 828, 535 *N.Y.S.*2d 871 (Sup.Ct. 1988) (gay life partner of deceased tenant of rent-controlled apartment sought protection in ordinance afforded to a spouse); *Ross v. Denver Dept. of Health and Hospitals,* 883 *P.*2d 516 (Colo.Ct.App.1994) (same-sex partner sought classification as "immediate family" for purposes of obtaining sick leave to take care of her ill domestic partner).

A review of the cases dealing with the challenges to marriage statutes is enlightening on the constitutional issues raised in the present case. In 1971, the Supreme Court of Minnesota decided *Baker v. Nelson,* 291 *Minn.* 310, 191 *N.W.*2d 185 (1971), *appeal dismissed,* 409 *U.S.* 810, 93 *S.Ct.* 37, 34 *L.Ed.*2d 65 (1972), and it has since been cited by every court faced with a constitutional challenge to same-sex marriages. At that time, Minnesota statutes did not expressly prohibit same-sex marriages, but the court held that the use of the term marriage was one of common usage

meaning the state of union between persons of the opposite sex. It is unrealistic to think that the original draftsman of our marriage statutes, which date from territorial days, would have used the term in any different sense. The term is of contemporary significance as well, for the present statute is replete with words of heterosexual import such as "husband and wife" and "bride and groom...."

[*Id.* 191 *N.W.*2d at 186.]

The court concluded that the Minnesota statutes did not authorize same-sex marriages. *Ibid.*

The court rejected the contention that, as interpreted, the statute denied appellants' fundamental right to marry without regard to the sex of the parties. *Id.* at 186–87. There was no due process violation because the historic institution of marriage, "as a union of man and woman, uniquely involving the procreation and rearing of children within a family," was more deeply founded than any asserted concept of same-sex marriage and societal interests. *Id.* at 186. Nor was there any equal protection clause violation:

The equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry. There is no irrational or invidious discrimination. Petitioners note that the state

does not impose upon heterosexual married couples a condition that they have a proved capacity or declared willingness to procreate, posing a rhetorical demand that this court must read such condition into the statute if same-sex marriages are to be prohibited. Even assuming that such a condition would be neither unrealistic nor offensive under the *Griswold* [*v. Connecticut,* 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965)] rationale, the classification is no more than theoretically imperfect. We are reminded, however, that "abstract symmetry" is not demanded by the Fourteenth Amendment.

[*Id.* 191 *N.W.*2d at 187 (footnote omitted).]

In *Singer v. Hara,* 11 *Wash.App.* 247, 522 *P.*2d 1187 (1974), two males appealed denial of their application for a marriage license alleging state and federal constitutional rights violations. The Washington marriage statute did not expressly prohibit same-sex marriages, and by its language it authorized marriages by "persons of the age of eighteen years, who are otherwise capable." *Id.* 522 *P.*2d at 1189. Nevertheless, because the Legislature had amended the statute to substitute the word "persons" for prior references to males and females, and because another statute relating to marriage license affidavits referred to "the male" and "the female," the Washington Court of Appeals concluded that the Legislature did not intend to authorize same-sex marriages. *Ibid.*

Even though the Washington constitution contained an equal rights amendment guaranteeing equality regardless of sex, the court found no violation of that provision, concluding that the denial of the license was not based on appellants' status as males. *Id.* 522 *P.*2d at 1195. Rather, the refusal was based on the State's recognition that society as a whole "views marriage as the appropriate and desirable forum for procreation and rearing of children," the possibility of which does not exist in a same-sex marriage. *Ibid.*

Therefore the definition of marriage as the legal union of one man and one woman is permissible as applied to appellants, notwithstanding the prohibition contained in the ERA, because it is founded upon the unique physical characteristics of the sexes and appellants are not being discriminated against because of their status as males per se.

[*Ibid.*]

With respect to federal constitutional violations, the court found none. The court employed the traditional rational relationship or

reasonable basis test rather than a strict scrutiny test because it concluded that to define marriage to exclude same-sex relationships does not create an inherently suspect legislative classification, citing *Baker v. Nelson, supra. Id.* 522 *P.*2d at 1195–96. The court found there was a rational basis to exclude same-sex relationships from the definition of marriage and that, in any event, it was up to the Legislature, not to the courts, to make changes if change was required to reflect societal values. *Id.* at 1197.

In the now-famous case of *Baehr v. Miike,* 1996 WL 694235, 65 *U.S.L.W.* 2399 (Hawai'i Cir.Ct.1996), the trial court, upon remand from the Supreme Court of Hawaii, considered whether the denial of plaintiffs' applications for marriage licenses on the ground that the couples were of the same sex, deprived them of equal protection of the law under the Hawaiian constitution. Three years earlier the Hawaii Supreme Court considered the case when plaintiffs sought a declaratory judgment that Hawaii's marriage statute was unconstitutional. *Baehr v. Lewin,* 74 *Haw.* 530, 852 *P.*2d 44 (1993). The statute in existence at that time did not expressly state, as it does now, that a valid marriage contract can only be between a man and a woman. In 1991 the statute merely made reference to "the man and woman to be married." *Id.* 852 *P.*2d at 49.

The Hawaiian trial court had granted the motion of the Director of the Department of Health for judgment, finding that he properly withheld the marriage license and was entitled to a judgment as a matter of law and upholding the department's interpretation of the statute as prohibiting same-sex marriages. *Id.* at 52. The Hawaii Supreme Court refused to extend the present boundaries of the fundamental right of marriage to include same-sex couples, holding that the "right to same-sex marriages is [not] so rooted in the traditions and collective conscience of [society] that failure to recognize it would violate the fundamental principles of liberty and justice that lie at the base of our civil and political institutions." *Id.* at 57. Nonetheless, the Court concluded that appellants should have been given an opportunity to establish that they were

denied equal protection of the laws under the Hawaii Constitution, which is broader than the federal Equal Protection Clause, and provides that "[n]o person shall ... be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex, or ancestry." *Id.* at 59–60, 68. The court found the marriage statute established a sex-based classification and that the matter had to be examined at a plenary proceeding, in accordance with the "strict scrutiny" standard. *Id.* at 67. It would be the state's burden "to overcome the presumption that [the statute was] unconstitutional by demonstrating that it further[ed] compelling state interests and [was] narrowly drawn to avoid unnecessary abridgments of constitutional rights." *Id.* at 68. On remand, the trial court concluded that the state failed to bear its burden and enjoined the state from denying marriage license solely because the applicants were of the same sex. *Baehr v. Miike*, 1996 WL 694235 at *47–48.

The appellants in *Dean v. District of Columbia*, 653 A.2d 307 (D.C.App.1995), unsuccessfully challenged the gender-neutral language of the district's marriage statute, which had been interpreted to prohibit same-sex marriages, on federal due process grounds and an alleged violation of the District of Columbia's Human Rights Act. The Court of Appeals concluded that Congress had intended marriage to have its traditional meaning, that is, that it was inherently a male-female relationship. *Id.* at 312–15. After rejecting appellant's human rights act claim, *id.* at 318–20, the court concluded that same-sex marriage was not a fundamental right protected by the Due Process Clause because that kind of relationship was not deeply rooted in this country's history and tradition. *Id.* at 331. The majority also held that the statute did not violate appellant's equal protection rights, with one judge dissenting. The dissenter concluded that the question required the court to determine whether "the classification at issue, unrelated adult homosexual couples, can serve as a legitimate basis for excluding persons from a state benefit ... [,] which is available

virtually without limitation to unrelated adult heterosexual couples." *Id.* at 334 (footnote omitted).

Finally, the New York Supreme Court, in *Storrs v. Holcomb*, 168 *Misc.*2d 898, 645 *N.Y.S.*2d 286 (Sup.Ct.1996), rejected the claim of two men that they were entitled to a marriage license despite the absence of statutory authorization therefore. Relying upon the decision of its highest court in *Matter of Cooper*, 187 *A.D.*2d 128, 592 *N.Y.S.*2d 797, *appeal dismissed*, 82 *N.Y.*2d 801, 604 *N.Y.S.*2d 558, 624 *N.E.*2d 696 (1993), the court considered itself bound by the holdings that marriage was "limited to opposite sex couples and that the gender classification serve[d] a valid public purpose." *Id.* 645 *N.Y.S.*2d at 287. In *Cooper, supra,* the New York court adopted wholeheartedly the analysis of the Minnesota Supreme Court in *Baker v. Nelson, supra,* and concluded that defining the term "surviving spouse" as excluding same-sex partners was not unconstitutional; it did not violate the equal protection clause of the state's constitution, as there was no irrational or invidious discrimination. 592 *N.Y.S.*2d at 799–800.

Here, our response to plaintiff's claim for relief is restricted by our role as a court that cannot enact laws or create benefits. We must interpret the statutes and laws enacted by the Legislature and the framers of our constitutions. Therefore, our limited answer to their equal protection argument is that it is not only homosexual couples that cannot legally marry and thus, cannot qualify as a dependent domestic partner for enrollment under the SHBP. Cousins, parents, children over 23 years of age, siblings, or anyone related too closely by blood, including those persons legally married to another, cannot qualify for benefits because of the marriage requirement, no matter how dependent or emotionally bonded they may be.

We see no intent by the Legislature, in enacting SHBP, to discriminate against lesbian or gay male persons. We accept the administrative and financial policy reasons offered by the State as the basis for the limited benefits afforded by the SHBP Act. It is not for this court to agree or disagree with the Legislature's

decision on such issues. These are political and economic issues to be decided by the elected representatives of the people. Nor is it for this court to weigh how great or small the additional cost of benefits is, or to weigh the difficulty of administration unless it be *de minimis,* which we do not believe it to be. That employers in the private sector or that other states have led the way in exploring methods of administering extended health benefits in a convenient, cost-efficient way is not a reason for this court to substitute its judgment for that of the Legislature. Moreover, plaintiffs do not appear to be barred from utilizing the collective bargaining process to seek supplemental private plan coverage for dependents who may not qualify under the SHBP.

Plaintiffs urge that by denying health coverage to homosexual employees' domestic partners, defendants, who are part of the executive branch, violated Executive Order No. 39 ("E.O.39"). E.O. 39, issued by the Governor in 1991, prohibits executive branch agencies from discriminating in the provision of services or benefits on the basis of sexual orientation. It provides, in part:

2. No Executive Branch department, agency, board, commission or other body shall discriminate on the basis of sexual orientation against any person in the provision of any service or benefit by such department, agency, board, commission or other body.

Defendants contend, however, that E.O. 39 does not apply because the SHBP classification refers to marital status, not sexual orientation. This is the approach taken by the California court in *Hinman, supra,* 213 *Cal.Rptr.* at 419. As we have pointed out, it is not only homosexual partners that are prohibited from marrying, therefore, the SHBP Act cannot be said to "discriminate on the basis of sexual orientation." Moreover, if E.O. 39 were to be applied to the SHBP it would be in derogation of the Legislature's prohibition against applying the LAD in a way that interferes with bona fide employee benefit plans. *N.J.S.A.* 10:5–2.1. An interpretation of an executive directive that would override such a legislative pronouncement must be scrupulously avoided.

The determination of the Division of Pensions denying SHBP coverage is affirmed. We dismiss plaintiffs' complaint as to the

State defendants and we dismiss their appeal. We remand as to the claims against Rutgers, as they are not before this court.

BAIME, J.A.D., concurring.

What goes on in other people's bedrooms is a question that has intrigued me since reaching puberty, but it is none of my business. I thus find it distasteful to uphold the denial of health insurance to the dependents of a deserving segment of the workforce merely because of their sexual predilections. To be sure, the State Health Benefits Program Act (*N.J.S.A.* 52:14–17.25 et seq.) is neutral both with respect to gender and sexual orientation. However, the statutory reference to "employee's spouse" in the Act's definition of "dependents," *N.J.S.A.* 52:14–17.26(d), indirectly discriminates against homosexual domestic partners who, because they are unable to enter into lawful marriage, are denied health benefits routinely enjoyed by similarly situated heterosexuals. The State seeks to perpetuate this injustice essentially on the grounds of administrative convenience. But other states, cities and private institutions have extended employee benefits to same-sex domestic partners without the severe dislocations envisioned by the Attorney General. The short answer to the State's argument is that it can be done, but New Jersey chooses not to do it.

Despite this evident unfairness, I join in the decision of the court essentially for the reasons expressed by Judge Shebell. It is not our function as judges to construe statutes in accordance with our privately held views of justice. Instead, we must apply the law as written. The statutory language is crystal clear. There is no room for interpretation. We are obliged to enforce the clearly expressed legislative intent.

Nor does the New Jersey Constitution afford a remedy. Appellants point to a lengthening line of decisions in which the courts have relied upon state constitutional provisions in creating new rights and remedies. They argue that good law is simply a matter of fairness, and what is just in a given case merely requires us to summon the state constitution to rationalize the appropriate re-

sult. But we would be myopic were we to see only the case before us. When the people perceive that they are not justly governed, the rallying cry is to throw the rascals out. But we judicial rascals are not answerable to the electorate and, absent calumny, enjoy the powers of our office for life. We must take care not to read the constitution to embrace subjects never thought to be within its reach. The more the state constitution is found to be intolerant of disagreement, the deadlier becomes the grip upon the people's inventiveness. *Cf. State v. Funicello*, 60 *N.J.* 60, 71, 286 *A.*2d 55 (C.J. Weintraub, concurring), *cert. denied*, 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972). The price of such intolerance may be sterility. *Ibid.*

The most cherished principle in our system is that government rests on the consent of the governed. The central idea is that in the meandering course of history, there is time for visions and revisions—for mistakes to be made by the people and rectified by the people. Democracy has its price. Good people are sometimes hurt, even destroyed, in the process. But, surely, the judiciary does not have a monopoly on justice. Appellants must seek redress in another forum.

PAUL G. LEVY, J.A.D., concurring.

Like Judge Baime, I, too, "find it distasteful to uphold the denial of health insurance to the dependents of a deserving segment of the workforce merely because of their sexual predilections." And I, too, join in the majority decision essentially for the reasons so clearly expressed by Judge Shebell. However, I am not convinced from the record that the addition of "domestic partner" to the definition of "dependents" in *N.J.S.A.* 52:14–17.26(d) will interfere with "the governmental goal of creating a workable administrative scheme that can be applied in a uniform and objective manner" observed by Judge Shebell. While it is clear that the SHBP is facially neutral and there is no showing of a discriminatory legislative purpose at its enactment in 1961, and the statutory definition of "dependents" as either a spouse or

unmarried children under the age of twenty-three living at home may be objectively determined and avoids conflict inherent in subjective analyses, times have changed. Domestic partners and spouses and children are more and more becoming extended families with interwoven economic dependencies.

As my colleagues have stated, our individual views of justice cannot override the clear intent of the Legislature. However, to remain faithful to our oath of office to "bear true faith and allegiance" to the state Constitution and to "the Governments established in ... this State," *N.J.S.A.* 41:1–1, we should express more than the thought that appellants should approach the Legislature, vested with the law-making power, rather than the Judiciary, vested with the law-interpreting power.

This issue warrants immediate legislative attention and we should say so. Health care plans are expensive and difficult to obtain, and the denial of health care benefits under the SHBP to employees in plaintiffs' circumstances is so unjust, that we should actively commend to the Legislature that it re-examine the class of dependents of state employees eligible to receive those benefits. It is not unusual for an appellate court to make a recommendation to the Legislature while upholding current legislation. As Justice Jacobs said, when examining a statutory scheme for compensation of tenured state employees who have been suspended, "we take the liberty of suggesting that the issues are of sufficient public importance to warrant further legislative consideration of the entire subject." *DeMarco v. Bd. Chosen Freeholders of Bergen Cty.,* 21 *N.J.* 136, 147, 121 *A.*2d 396 (1956). *See also All American Auto Salvage v. Camp's Auto Wreckers,* 146 *N.J.* 15, 30, 679 *A.*2d 627 (1996) (as to the rights of banks, depositors, and judgment creditors to funds on deposit, "[w]e commend consideration of the issue to the Legislature."); *Riverview Realty, Inc. v. Williamson,* 284 *N.J.Super.* 566, 570, 665 *A.*2d 1150 (App.Div.1995) (recommending Legislature consider when a tenant dies whether her family members should be evicted or whether they should remain in the apartment under the Anti–Eviction Act); *State In Interest*

of *A.W.S.*, 182 *N.J.Super.* 278, 282, 440 *A.*2d 1144 (App.Div.1981) (recommending Legislature amend statute regarding whether unborn viable fetuses should be treated as persons for purposes of criminal homicide by automobile); *Tp. of Andover v. Kymer*, 140 *N.J.Super.* 399, 406, 356 *A.*2d 418 (App.Div.1976)(recommending Legislature consider reforming farmland assessment status for those landowners seeking a tax shelter).

Additionally, twenty years ago, Justice, then Judge, Handler wrote that "[t]he historic assumption in the application of common law and statutory strictures relating to marriages is that only persons who can become 'man and wife' have the capacity to enter marriage." *M.T. v. J.T.*, 140 *N.J.Super.* 77, 84, 355 *A.*2d 204 (App.Div.), *certif. denied*, 71 *N.J.* 345, 364 *A.*2d 1076 (1976). Our marriage act may be consistent with that thought, as Judge Shebell points out here, in the reference to obtaining a marriage license in either the municipal residence of the "female party" or "the male party" to the marriage. *N.J.S.A.* 37:1–3(a), (b). But other sections of the act ignore homosexual partnerships. *N.J.S.A.* 37:1–1 prohibits marriages between a man and certain closely related sisters or daughters and marriages between a woman and certain closely related brothers or sons. It does not prohibit marriages between a man and his brother, son or any other man, nor marriages between a woman and her sister, daughter or any other woman. Also, the statutorily mandated terms of the marriage license are gender neutral. *N.J.S.A.* 37:1–7. Similarly neutral is *N.J.S.A.* 37:1–9, which prohibits issuance of a marriage license when "either applicant is infected with a venereal disease in a communicable stage, or is currently adjudicated mentally incompetent." This all indicates the Legislature was not considering the possibility of a "non-traditional" marriage when it enacted the various sections of the marriage laws. Therefore, one could argue that it was not the intent of the Legislature to deny marriage and its associated benefits to same-sex couples. As Justice Handler recognized in *M.T. v. J.T.*, *id.* at 83–84, 355 *A.*2d 204, there are "winds of change" sometimes to be considered. Accordingly, I also commend to the Legislature its examination of

the marriage laws to consider the creation of legal responsibilities between domestic partners, both homosexual as well as heterosexual, perhaps based on objective criteria to permit registration of a domestic partnership as is recognized in New York City pursuant to *Mayoral Executive Order 48 of 1993.*