177 N.J. Super. 66 (1981)
424 A.2d 1192
STUDENT MEMBERS OF THE PLAYCRAFTERS, AN ORGANIZATION OF TEANECK HIGH SCHOOL, RICHARD STREAN, AN INFANT BY HIS GUARDIAN AD LITEM, MARCIA STREAN, JEREMY FEIGELSON, AN INFANT BY HIS GUARDIAN AD LITEM, MIRIAM C. FEIGELSON, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
THE BOARD OF EDUCATION OF THE TOWNSHIP OF TEANECK, AUBREY SHER, SUPERINTENDENT OF SCHOOLS OF THE TOWNSHIP OF TEANECK, AND JAMES DELANEY, PRINCIPAL OF TEANECK HIGH SCHOOL, AND NEW JERSEY STATE COMMISSIONER OF EDUCATION, FRED G. BURKE, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 9, 1980.
Decided January 19, 1981.
*68 Before Judges MICHELS, ARD and FURMAN.
John L. Weichsel, attorney for appellants and cross-respondents (Stephen Nagler, ACLU of New Jersey, of counsel).
Greenwood, Weiss & Shain, attorneys for respondents and cross-appellants Board of Education of the Township of Teaneck and James Delaney, Principal of Teaneck High School (Robert H. Greenwood, on the brief).
John J. Degnan, Attorney General of New Jersey, attorney for respondent and cross-appellant New Jersey State Commissioner of Education, Fred G. Burke (Stephen Skillman, Assistant Attorney General, of counsel; Mary Ann Burgess, Deputy Attorney General, on the brief).
*69 Daniel D. Chazin submitted a brief on behalf of amicus curiae The National Jewish Commission on Law and Public Affairs (Martin B. Cowan, of the New York bar, of counsel).
Victoria B. Eiger submitted a brief on behalf of amicus curiae The American Jewish Congress (Marc D. Stern, of the New York bar, of counsel).
The opinion of the court was delivered by MICHELS, P.J.A.D.
This is an appeal from a judgment of the Chancery Division which found that the "Policy on School Activities," adopted by defendant Board of Education of the Township of Teaneck (Board) was facially constitutional, yet unconstitutional as applied. At issue is whether the Board's policy, which effectively bans most extracurricular scholastic activities during times of traditional religious worship, namely Friday evenings, Saturday days and Sunday mornings, violates the Establishment Clauses of the Federal and State Constitutions.[1]
The policy was adopted by the Board in an effort to implement State statutory and regulatory enactments which had, as their objective, the elimination of all discriminatory practices in the New Jersey public schools. In 1974, our Legislature enacted N.J.S.A. 18A:36-20 which provides that:
No pupil in a public school in this State shall be discriminated against in admission to, or in obtaining any advantages, privileges or courses of study of the school by reason of race, color, creed, sex or national origin.
The New Jersey State Board of Education (State Board) developed and adopted regulations to implement the legislative mandate set forth in N.J.S.A. 18A:36-20. These regulations *70 require each local school district to develop and adopt a policy of equal educational opportunity and two programs of affirmative action, the first relative to school and classroom practices and the second concerning employment and contract practices. N.J.A.C. 6:4-1.1 et seq., (effective, May 20, 1975). N.J.A.C. 6:4-1.5(a) specifically provides:
No student shall be denied access to or benefit from any educational program or activity solely on the basis of race, color, creed, religion, sex, ancestry, national origin or social or economic status.
N.J.A.C. 6:4-1.2 defines "educational activities and programs" as "all activities and programs conducted or sponsored by the school either during the school day or after regular school hours."
On March 9, 1977, the Board, pursuant to N.J.S.A. 18A:36-20 and N.J.A.C. 6:4-1.1 et seq., adopted a "Policy on School Activities." The Board, observing that the "scheduling of programs or activities on the Sabbath may result in a denial of equal opportunity based upon religion," passed a resolution which provided:
1. To the maximum feasible extent, school activities and programs will not be scheduled on a Friday night, Saturday day, or Sunday morning.
2. A reasonable accommodation to requests for an exception will be made on an individual program or activity basis. Such requests setting forth reasons for exceptions must be submitted, in writing, by the principal to the Superintendent of Schools who will decide on the matter.
Thereafter, on April 21, 1977, the Board modified its policy. The Board directed the Superintendent of Schools "to schedule all school activities to the maximum feasible extent" to "increase participation [in school activities] among all students." The Board also appointed an advisory committee to help develop guidelines to be considered by the Superintendent in the scheduling of after school activities. The objective of these guidelines was:
... to assure that all students will have equal opportunity to participate in Board of Education-sponsored after-school activities. It is the responsibility of the school principal in scheduling after-school activities to be sensitive to the needs of the pluralistic population making up the Teaneck Public School System.
This matter arises as a result of the application of the Board's policy to the proposed scheduling of the play "Don't Drink the *71 Water" during the Fall semester of the 1978-1979 school year. The play which was to be performed by The Playcrafters, the Teaneck High school drama club, was originally scheduled for Thursday, Friday and Saturday evenings, if double-cast. The faculty advisor for The Playcrafters was thereafter informed that the play could not be performed on Friday evening.
On November 14, 1978, plaintiffs instituted this action by a verified complaint and order to show cause, seeking to enjoin the implementation of the Board's policy so that the Fall play could be performed on Friday evening, November 17, 1978. The trial court enjoined the implementation of the policy, and consequently, the play was performed as scheduled. Thereafter, respondents Board, Aubrey Scher, Superintendent of Schools of the Township of Teaneck and James Delaney, Principal of Teaneck High School, filed an answer and moved to dismiss the action.
The trial court directed all parties to submit copies of their pleadings, briefs and other materials to respondent Fred G. Burke, New Jersey State Commissioner of Education (Commissioner) so that he could determine whether to participate in the matter as either a party defendant or as amicus curiae. After reviewing the submitted material, the Commissioner appeared in the case for the limited purpose of advancing the jurisdictional argument that the action should be dismissed and the parties should proceed before him as the controversy arose under the State's school laws. Thereupon, the trial court directed all parties to show cause why an order should not be entered (1) either joining the Commissioner as a party or authorizing him to appear amicus curiae; (2) staying the present action pending an appeal to the Commissioner of those issues within his jurisdiction, and (3) determining which issues are properly cognizable before the Chancery Division and which are within the jurisdiction of the Commissioner. On the return date of the order to show cause, the trial court (1) denied the Commissioner's motion to dismiss the complaint for failure to exhaust administrative remedies; (2) joined the Commissioner as a party defendant, and *72 (3) ordered the following educational issues be referred to the Commissioner for resolution based upon the record developed before it:
(1) whether the Policy on School Activities, adopted by the Teaneck Board of Education, represents a proper implementation of N.J.S.A. 18A:36-20 and N.J.A.C. 6:4-1.1 et seq., and
(2) whether the Policy on School Activities, adopted by the Teaneck Board of Education, so restricts the use of school facilities as to preclude the breadth of program offerings and activities necessary to a thorough and efficient system of public education.
The Commissioner, after reviewing the Board's Policy on School Activities, observed:
The Board's obvious purpose for establishing such a policy and guidelines was to avoid imposing upon pupils the difficult choice between participation in a school activity and a Sabbath observance. The record in this matter discloses a continuing sensitivity on the part of the Board to the values of the pluralistic community served by its public schools.
Consequently, the Commissioner found that the policy represented a proper implementation of N.J.S.A. 18A:36-20 and N.J.A.C. 6:4-1.1 et seq. The Commissioner also found that the Board's Policy did not curtail the breadth of extracurricular activities included in its total program and, therefore, did not prevent the Board from providing the pupils of Teaneck with a thorough and efficient system of education. Finally, the Commissioner reviewed the application of the Board's policy with regard to the scheduled Fall play, and concluded that:
... the Board erred in the particular instance of the Fall play, and should have permitted the performance on the originally scheduled Thursday, Friday and Saturday evenings. This is so, because the casting of the play was arranged to avoid any conflict for participating pupils. Since this was done, and no pupil was denied an opportunity to participate, the play should have been performed as approved by the Principal and the Superintendent. The Commissioner finds that the Board abused its discretion in the implementation of its policy in this particular instance.
Notwithstanding the Commissioner's views, the trial court found that the Board's policy saving pupils from having to choose between religion and extracurricular activities (1) did not serve a secular purpose; (2) had, as its primary effect, the advancement of religion, and (3) involved excessive entanglement by virtue of its "divisive effect." The trial court, therefore, *73 concluded that the policy, as applied, violated the Establishment Clause of the First Amendment of the Constitution of the United States and Article I, Paragraph 4 of the Constitution of New Jersey, and ordered that the upcoming Spring play, "Guys and Dolls", include a Friday evening performance. The trial court entered judgment declaring that the Policy on School Activities to be facially constitutional, but unconstitutional as applied. Plaintiffs appeal and respondents cross-appeal.

I.
Preliminarily, we disagree with the Commissioner's contention that the challenge to the Board's policy should have been dismissed by the trial court for failure of plaintiffs to exhaust their administrative remedies. Ordinarily, administrative remedies must be exhausted before resort is had to the courts. However, the exhaustion doctrine is neither jurisdictional nor absolute. Garrow v. Elizabeth General Hospital and Dispensary, 79 N.J. 549, 561-562 (1979); Matawan Borough v. Monmouth Cty. Tax Bd., 51 N.J. 291, 296-297 (1968). One of the exceptions to the doctrine arises when only a question of law need be resolved. Nolan v. Fitzpatrick, 9 N.J. 477, 487 (1952). Thus, when, as in this matter, the only challenge to the Board's policy is based on constitutional grounds and no factual issues exist which require administrative determination, the doctrine of exhaustion is not applicable, and judicial intervention is justified. See Garrow v. Elizabeth General Hospital and Dispensary, supra 79 N.J. at 561-562; Paterson Redevelopment Agency v. Schulman, 78 N.J. 378, 387-388 (1979), cert. den. 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979); Brunetti v. Borough of New Milford, 68 N.J. 576, 590 (1975).
We also disagree with the Commissioner's contention that the appeal is moot because the individual plaintiffs may no longer be attending Teaneck High School. The public interest warrants a resolution of the matter since the issues are of public importance and are bound to recur in the future. State v. Allen, *74 73 N.J. 132, 138-139 (1977); John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 579 (1971). See also, Busik v. Levine, 63 N.J. 351, 364 (1973), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973); United Hunters Assn. of N.J., Inc. v. Adams, 36 N.J. 288, 293 (1962); Humane Society of the U.S., etc. v. Guido, 173 N.J. Super. 223, 228 (App.Div. 1980).
We turn therefore to the merits of the appeal.

II.
The essential thrust of plaintiffs' challenge to the Policy on School Activities is that it represents an establishment of religion violative of both the Federal and State Constitutions.
The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The First Amendment is applicable to the states through the Fourteenth Amendment. Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), reh. den. 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 702 (1975). However, similar protections are afforded religion by Article I, Paragraph 4 of the New Jersey Constitution, which, in pertinent part, provides: "There can be no establishment of one religious sect in preference to another...."
In discussing the Establishment Clause of the United States Constitution in the light of state action, Chief Justice Burger in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), reh. den. 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971), observed:
The language of the Religion Clauses of the First Amendment is at best opaque, particularly when compared with other portions of the Amendment. Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be "no law respecting an establishment of religion." A law may be one "respecting" the forbidden objective while falling short of its total realization. A law "respecting" the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *75 establish a state religion but nevertheless be one "respecting" that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment.
In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: "sponsorship, financial support, and active involvement of the sovereign in religious activity." Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409 [1411], 25 L.Ed.2d 697, 701 (1970).
Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923 [1926], 20 L.Ed.2d 1060, 1065 (1968); finally, the statute must not foster "an excessive government entanglement with religion." Walz, supra [397 U.S.], at 674, [90 S.Ct. at 1414,] 25 L.Ed.2d at 704. [403 U.S. at 612-613, 91 S.Ct. at 2111, 29 L.Ed.2d at 755]
The three-pronged test set forth in Lemon v. Kurtzman, supra, has come to be commonly referred to as the "Lemon" test and is utilized by courts in determining whether state action survives an Establishment Clause attack. Meek v. Pittenger, 421 U.S. at 358, 95 S.Ct. 1759-1760, 44 L.Ed.2d at 227-228; Committee for Public Education v. Nyquist, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948, 963 (1973); Resnick v. E. Brunswick Tp. Bd. of Ed., 77 N.J. 88, 108 (1978).
Here the trial court found that the Board's policy failed each component of the three-pronged Lemon test. Specifically, the trial court found that its purpose was not secular because it allowed students to prefer their religion over school activities; that its primary effect was to advance religion because of the "mere possibility that the policy might serve a religious function," and finally, that excessive governmental entanglement caused a "divisive effect" upon the community, apparently referring to protests by some members of the community.
We are firmly convinced that the Board's policy meets the three-pronged Lemon test, and consequently passes constitutional muster. At the outset, in order to pass the "secular purpose" test, "little more is required than a reasonable legislative statement announcing a colorable secular design." Resnick *76 v. E. Brunswick Tp. Bd. of Ed., 77 N.J. at 108. While the Board's action may have the effect of respecting religious views by scheduling extracurricular school activities on days and at times which would not conflict with most religious services, the ultimate "colorable secular design" clearly was to comply with statutory and regulatory mandates that participation in such activities not be denied by reason of, among other things, religion. We must not lose sight of the fact that the First Amendment does not mandate hostility or callous indifference to religious practices. To do so would be to prefer those who do not believe in religion over those who do. Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed.2d 954 (1952). What the Constitution does require is "neutrality in the face of religious differences," Sherbert v. Verner, 374 U.S. 398, 409, 83 S.Ct. 1790, 1797, 10 L.Ed.2d 965, 974 (1963), a "benevolent neutrality." Walz v. Tax Commission, 397 U.S. 664, 676, 90 S.Ct. 1409, 1415, 25 L.Ed.2d 697, 706 (1970).
The policy here under review represents an effort by the Board to enable its students to participate as fully as possible in extracurricular scholastic activities without infringing on the religious liberties of those students. Thus, the policy brings into play the "free exercise" cases decided by the United States Supreme Court. For example, in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court held that children of the Amish faith could be excused from complying with state compulsory education laws, where such compliance would violate a fundamental Amish tenet and where the state's interest in educating its citizens was otherwise assured by practices of the Amish community. In rejecting an Establishment Clause argument, the Supreme Court said:
... Accommodating the religious beliefs of the Amish can hardly be characterized as sponsorship or active involvement. The purpose and effect of such an exemption are not to support, favor, advance, or assist the Amish, but to allow their centuries-old religious society, here long before the advent of any compulsory education, to survive free from the heavy impediment compliance with the Wisconsin compulsory-education law would impose. Such an accommodation "reflects nothing more than the governmental obligation of neutrality in the *77 face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." Sherbert v. Verner, 374 U.S. 398, 409, 83 S.Ct. 1790, [1796], 10 L.Ed.2d 965, 974 (1963). [406 U.S. at 234 n. 22, 72 S.Ct. at 1542-1543 n. 22, 32 L.Ed.2d at 36 n. 22]
Furthermore, permissible accommodations to religion can take the form of avoiding conflicts between secular and religious activities:
... School administrators should, of course, be sensitive to the religious beliefs or disbeliefs of their constituents and should attempt to avoid conflict, but they need not and should not sacrifice the quality of the students' education. They need only ensure that the primary effect of the school's policy is secular. [Florey v. Sioux Falls School Dist. 49-5, 619 F.2d 1311, 1317 (8 Cir.1980), footnote omitted]
Additionally, we do not find that the policy has the "primary effect" of advancing religion. Concededly, the policy does have some religious effect in that religious believers are relieved of the burden of choosing between a school and a religious activity. However, the focus is on the degree of the effect. Here, it is not primary, but merely incidental, an impact which is permissible. See Resnick v. E. Brunswick Tp. Bd. of Ed., supra, 77 N.J. at 110. Zorach v. Clauson, supra, sanctions the type of policy here under review. In the Zorach case, the court concisely set forth the parameters of permissible accommodation by a public school to religious beliefs, stating:
... We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to *78 attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. [343 U.S. at 313-314, 72 S.Ct. at 684, 96 L.Ed. at 962; emphasis supplied]
The trial court also erred in holding that political opposition or community divisiveness can qualify as excessive entanglement. In Resnick v. E. Brunswick Tp. Bd. of Ed., supra, our Supreme Court pointed out that excessive entanglement is typically framed in terms of "effect on the public purse," such as by financial aid or tax benefits to religious schools. In the Resnick case, the challenged policy was permitting religious groups to rent school premises at a nominal fee for meetings during non-school hours. The court, finding that there was not any constitutionally prohibited entanglement, stated:
... No significant administrative function is involved. The processing of an application by a clerk is hardly an act of excessive entanglement. Moreover, inasmuch as no use of school premises is made during regular school hours, there is no need of supervision to insure that no religion seeps into secular instruction. The danger of political fragmentation is miniscule, as appropriations are not involved. The mere fact that some persons in the community oppose the use of the schools by sectarian groups should not prevent these groups from enjoying the benefits of premises which the tax dollars of many of their members helped to construct. [77 N.J. at 116; emphasis supplied]
The Supreme Court also held that while the policy "indicates at least a lack of disapproval on the part of the Board respecting the activities of these groups, it in no way constitutes an endorsement of their creed." Id. at 118.
Accordingly, we hold that the Board's Policy on School Activities is not violative of the Establishment Clause of either the Federal or State Constitutions, either on its face or as applied.
Finally, there is no merit in plaintiffs' claims that the Board's policy contains improper standards, is void for vagueness, and violates the freedom of speech provision of the United States Constitution. R. 2:11-3(e)(1)(E).
The judgment of the Chancery Division is affirmed in part and reversed in part.
NOTES
[1] Interscholastic athletic events are expressly excluded from the policy, as appears from the following policy guideline:

Interscholastic activities such as athletic events, where League, County or State determines the schedule will continue as is the present practice. All activities such as, but not limited to, marching band, cheerleaders and twirlers will also continue as is present practice.