770 A.2d 1222 (2001)
339 N.J. Super. 38
Verner STUBAUS and Laura Stubaus, Anthony J. McKenna and Theresa McKenna, Leonard P. Kiczak and Regina D. Kiczak, Bergenfield School District, Bloomingdale School District, Bloomfield Township Schools, Bordentown Regional Schools, Butler School District, Clearview School District, Delanco Township Schools, Dover Town Schools, East Amwell School District, East Windsor Regional School District, Edison Township School District, Estell Manor City Schools, Franklin Township Schools, Glen Ridge School District, Hackettstown School District, Hampton Borough School District, High Bridge School District, Highland Park School District, Jamesburg School District, Lenape Regional School District, Linwood City Schools, Manasquan School District, Matawan-Aberdeen Regional School District, Mount Arlington School District, Newtown School District, North Plainfield Borough Schools, Old Bridge Township Schools, Passaic County Manchester Regional School District, Piscataway School District, Pompton Lakes School District, Ringwood School District, Roselle Borough Schools, Roselle Park SchooL District, Sayerville School District, South Bound Brook Schools, Spotswood School District, Sussex-Wantage Regional Schools, Tabernacle Township Schools, Upper Freehold Regional Schools, Wanaque School District, Plaintiffs-Appellants,
v.
Christine Todd WHITMAN, Governor of the State of New Jersey, in her Official Capacity Only, Donald DiFrancesco, President of The New Jersey Senate, in his Official Capacity Only, Jack Collins, Speaker of the New Jersey Assembly, in his Official Capacity Only, Leo Klagholz, Commissioner of Education, in his Official Capacity Only, James Dieleuterio, Treasurer of the State of New Jersey, in his Official Capacity Only, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 2001.
Decided April 5, 2001.
*1225 David B. Rubin, Metuchen, for appellants (Mr. Rubin and David H. Coates, Hightstown, attorneys; Mr. Rubin and Mr. Coates, on the brief).
Michelle Lyn Miller, Deputy Attorney General, for respondent Christine Todd Whitman, Governor of New Jersey (John J. Farmer, Jr., Attorney General, Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Miller, on the brief).
Jean L. Cipriani, Toms River, for respondent Donald DiFrancesco, President of the New Jersey Senate (Gilmore & Monahan, attorneys; Ms. Cipriani, on the brief).
Before Judges COBURN, LEFELT and AXELRAD. *1223
*1224 The opinion of the court was delivered by LEFELT, J.A.D.
Plaintiffs, seven individual homeowners and property taxpayers and forty-two middle income school districts, sued the Governor, President of the Senate, Speaker of the Assembly, Commissioner of the Department of Education and State Treasurer, challenging the public school funding system that was established by N.J.S.A. 18A:7F-1 to -36, the Comprehensive Education Improvement and Financing Act of 1996 ("CEIFA"). Plaintiffs alleged that the funding system caused disparate tax burdens constituting violations of New Jersey's equal protection, N.J. Const. art. I, ¶, and thorough and efficient ("T & E"), N.J. Const. art. VIII, § 4, ¶ 1, constitutional clauses.
Plaintiffs appeal from the trial judge's orders dismissing the complaint with prejudice. The judge found the school districts did not have standing to bring this lawsuit and plaintiffs' claim was not viable under either equal protection or T & E. We agree with the trial judge and affirm.

I.
To resolve plaintiffs' contentions, some understanding of the funding system established by CEIFA is necessary. We, therefore, explain in simplified fashion the major concepts and procedures involved in establishing State T & E aid and each district's local share, which is the portion of the school budget each district must fund from local property tax levies.
School districts in New Jersey have been operating under CEIFA since 1997. CEIFA established core curriculum content standards. The core curriculum standards provide a substantive framework detailing what children need to know in order to participate as workers and citizens in contemporary society, which is the goal of a T & E public education system. Abbott v. Burke, 100 N.J. 269, 280-81, 495 A.2d 376 (1985)(Abbott I). CEIFA also *1226 established a model or prototypical school district that efficiently provides the programs and services necessary for students to achieve the core curriculum standards. Thus, CEIFA established a prototypical program that the Legislature believed would satisfy the T & E constitutional requirements. The per pupil cost to implement the prototypical model, combined with the local school district's ability to contribute to that cost, is the basis under CEIFA for distributing State educational aid.
To implement the financing provisions, the Commissioner of Education establishes a "T & E amount" that is based on the costs necessary to provide the programs and services that will enable an elementary school student to achieve the core curriculum standards. N.J.S.A. 18A:7F-3; N.J.S.A. 18A:7F-12. The T & E amount is then weighted for the additional cost of middle and high school students and a half-day kindergarten program. Ibid. The T & E weighted amount is then multiplied by the number of students in the district to arrive at the T & E budget. N.J.S.A. 18A:7F-3; N.J.S.A. 18A:7F-13.
The Commissioner also calculates a flexible range ("T & E range") above and below the T & E amount to address numerous variables that may affect district spending, such as existing teacher contracts, teacher seniority and regional costs. N.J.S.A. 18A:7F-3; N.J.S.A. 18A:7F-12. The T & E range is applied to the T & E budget to create a maximum and minimum T & E budget. However, Abbott districts, those property poor districts under the protections established in Abbott v. Burke, 119 N.J. 287, 575 A.2d 359 (1990)(Abbott II), have only a maximum budget. See N.J.S.A. 18A:7F-5(b); N.J.S.A. 18A:7F-13(c).
School districts have some limited discretion in their spending and may choose to go beyond the T & E maximum budget by increasing local tax levies or if the district was previously spending below the T & E minimum budget, remaining below the T & E minimum budget so local tax levies are not increased. N.J.S.A. 18A:7F-5d(1)-(3). However, if a school district proposes a budget exceeding the maximum T & E budget, the district must publish a special notice advising the public that the district "has proposed programs and services in addition to the core curriculum content standards adopted by the State Board of Education." Id. at 5d(10). A district which submits a budget at less than its minimum T & E budget may be compelled to increase spending if the district fails to meet the core curriculum standards. N.J.S.A. 18A:7F-6a.
Notwithstanding any discretionary action taken by the district to spend above or below the T & E maximum and minimum budgets, the T & E budget is also used for calculating each district's State aid. The complex formula, to establish the local share that each district must pay toward the T & E budget, reflects the relative wealth of the school district based on aggregate property values and income. See e.g., N.J.S.A. 18A:7F-14a &c. Once the local share percentage is established, the percentage is multiplied by the T & E budget to determine the local share of the budget that must be paid by the district. N.J.S.A. 18A:7F-14. Thus, wealthier districts pay a greater share of the T & E budget than do poorer districts. Each district's core curriculum standard aid is the T & E budget figure less the local share. N.J.S.A. 18A:7F-15.
In order to understand the standing issue, which we discuss next, we detail the *1227 precise claims plaintiffs have advanced. Plaintiffs challenge the constitutionality of CEIFA solely because they contend that the law has resulted in "wildly differing property tax burdens" for each school district. Thus, plaintiffs argue exclusively that middle income school districts are irrationally burdened by CEIFA's calculation of local share and state aid, and to be constitutional, the funding system must trend toward equalization of taxpayer burdens. Plaintiffs do not argue that the funding system results in program inadequacy or educational inequity in any district, nor do they argue that the district tax bases cannot support a T & E education.

II.
The plaintiff school districts contend they have standing to mount this constitutional challenge "as advocates of their respective taxpaying constituencies ... [and] as administrative bodies who make due with limited resources." Plaintiffs further assert that a "litigant who is forced to participate in an activity it believes to be unlawful surely has standing to seek relief."
To deal with plaintiffs' contentions, we first summarize the well established principles governing standing for litigants in New Jersey. "Standing refers to the plaintiff's ability or entitlement to maintain an action before the court. Courts will not entertain matters in which plaintiffs do not have sufficient legal standing." New Jersey Citizen Action v. Riviera Motel Corp., 296 N.J.Super. 402, 409, 686 A.2d 1265 (App.Div.), appeal dismissed, 152 N.J. 361, 704 A.2d 1297 (1998). To determine whether a party has standing, the court must determine "whether the party has a sufficient stake in and real adverseness with respect to the subject matter, and whether the party will be harmed by an unfavorable decision." In re Charter School Application of Englewood, 320 N.J.Super. 174, 222, 727 A.2d 15 (App.Div.1999), aff'd, 164 N.J. 316, 753 A.2d 687 (2000). Further, litigants, generally, do not have standing to assert the rights of third parties. State Dep't of Environmental Protection and Energy v. Dopp, 268 N.J.Super. 165, 173, 632 A.2d 1270 (App.Div.1993).
We interpret the issue of standing broadly and will not limit the doctrine to the "case or controversy" requirement of the United States Constitution. Loigman v. Township Committee of the Township of Middletown, 297 N.J.Super. 287, 294-95, 687 A.2d 1091 (App.Div.1997). However, courts "will not render advisory opinions or function in the abstract nor will [they] entertain proceedings by plaintiffs who are `mere intermeddlers' or are merely interlopers or strangers to the dispute." Crescent Pk. Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107, 275 A.2d 433 (1971) (citations omitted). Rather, there must be a substantial likelihood the party will suffer some harm by an unfavorable decision. N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n, 82 N.J. 57, 67, 411 A.2d 168 (1980).
With respect to plaintiffs' equal protection claims, courts generally recognize that political subdivisions of the State, including municipalities and local boards of education, lack the legal capacity to challenge State action based on equal protection grounds. Newark v. New Jersey, 262 U.S. 192, 196, 43 S.Ct. 539, 540, 67 L.Ed. 943, 946 (1923); McKenney v. Byrne, 82 *1228 N.J. 304, 315 n. 4, 412 A.2d 1041 (1980); In re Charter School Application of Englewood, supra, 320 N.J.Super. at 238, 727 A.2d 15. A local school board is accorded only those rights provided by statute. See Durgin v. Brown, 37 N.J. 189, 199, 180 A.2d 136 (1962). Because school districts are "creatures of the State," no school district can be the "subject of discriminatory practice by the State." Cf. Borough of Glassboro v. Byrne, 141 N.J.Super. 19, 23, 357 A.2d 65 (App.Div.), certif. denied, 71 N.J. 518-19, 366 A.2d 674 (1976).
In In re Charter School Application of Englewood, relied on by plaintiffs, several school districts challenged the Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to 18, based upon equal protection grounds. We decided the case on the merits only "because of the public interest and continuing controversy over the validity of the Act...." In re Charter School Application of Englewood, supra, 320 N.J.Super. at 238, 727 A.2d 15. However, we noted that we "could decline to reach appellants' equal protection theories" based on the premise that "[w]hile a political subdivision may be able to challenge the validity of a statute on some other constitutional grounds, it may not claim a denial of equal protection as to itself." Ibid. Similarly, in this case, the plaintiff school districts, as creatures of the State, do not have standing to challenge CEIFA on equal protection grounds.
The school districts also claim CEIFA is unconstitutional under T & E. Plaintiffs admit "that a government agency's parens patriae interest in protecting the general public, standing alone, is generally insufficient to support standing to challenge an exercise of power by another agency of the government." Plaintiffs argue, however, that there is standing when "a public body sues to vindicate its ability to function as contemplated by its enabling legislation."
In In re Charter School Application of Englewood, we concluded that a local district had standing to contend that the Charter School legislation thwarted its ability to comply with T & E requirements:
Franklin Township reasonably argues that as the delegate of the State Board, it is constitutionally charged with the "t & e" duty, and that the funding portion of the Charter School Program Act threatens to impair its ability to perform that duty by reducing its available funds. Moreover, Franklin Township also points out that the Act confers upon local districts the "exclusive" right to comment on an application and to appeal a grant. Hence, a local board should perforce be deemed to have standing to challenge the underlying statute. We recognize Franklin Township's standing to allege that the Act will thwart its "t & e" efforts.

[Id. at 223, 727 A.2d 15.]
Similarly, plaintiff school districts contend that they are "required to spend considerable time, money and other valuable resources annually on a budget and funding process which they contend is unlawful." According to plaintiffs they must "cope with ever-proliferating unfunded State and federal mandates, and an overburdened municipal tax base." However, unlike In re Charter School Application of Englewood, plaintiffs here do not assert that CEIFA leads to educational failures. Plaintiffs complain solely about the disparate and burdensome tax rates caused by CEIFA. Thus, the alleged inequity falls on taxpayers, not on the districts.
However the local share is calculated and no matter how large or small its relation *1229 to the total budget, the local districts have no choice, under CEIFA, but to continue to raise local taxes necessary to pay whatever the local share of the overall budget may be. The school districts have not demonstrated what injury the districts suffer from the disparate and burdensome tax levies plaintiffs contend must, as a result, be levied on taxpayers.
Similarly, this case is distinguishable from Board of Educ. of East Brunswick Tp. v. Township Council of East Brunswick Tp., 48 N.J. 94, 223 A.2d 481 (1966), which plaintiffs also rely on. There the local school board sued the municipality over school funding issues, and the Court concluded that "it had the right, if not the obligation, to seek review." Id. at 108, 223 A.2d 481. However, unlike plaintiff school districts in this case, there, the board alleged that a budget reduction would "deprive the local school system of necessary teaching staffs and physical facilities." Ibid. In other words, the East Brunswick district was complaining about municipal action that would result in educational failures. Id. at 98-99, 223 A.2d 481.
Moreover, plaintiffs have not demonstrated a sufficient stake or real adverseness in CEIFA's funding mechanism. In other words, the districts are arguing that CEIFA is unconstitutional because of the manner in which the local share is funded. The real party in interest is the taxpayers. Plaintiffs actually seek to have school taxes raised in another fashion that will, as they argue, trend toward equality. Perhaps plaintiffs hope that eventually instead of the heavy use of the property tax, the more equalizing income tax will be used to moderate or eliminate the property tax for funding public schools.
The districts undoubtedly feel strongly about the claimed inequities of CEIFA's funding system, but the school districts do not argue for any adjustments in their educational programs. The districts merely complain that they are forced to budget or spend money on and administer many educational programs and services that are mandated by the State, whether or not the district has an interest in conducting the program or offering the service. We conclude that a district's unhappiness with any State mandated educational program is an insufficient stake in this litigation to support the plaintiffs' T & E claim.
Moreover, the plaintiff school districts may not assert the rights of the districts' taxpayers in this case. Although we have allowed litigants to assert the rights of third parties, we have only done so in limited situations. For example, when a plaintiff suffers direct impairment of constitutional rights, that plaintiff may also assert the rights of third parties who find it difficult to bring their own claims. Trombetta v. Atlantic City, 181 N.J.Super. 203, 222, 436 A.2d 1349 (Law Div.1981), aff'd, 187 N.J.Super. 351, 454 A.2d 900 (App.Div.1982). Plaintiff may also raise the constitutional rights of a third party when the third party's rights are likely to be diluted or adversely affected unless they are raised by a plaintiff holding a confidential relationship with the third party. In re Estate of Neuwirth, 155 N.J.Super. 410, 419, 382 A.2d 972 (Probate Div.1978). Finally, we have also permitted a non-profit organization to sue on behalf of its injured members. In re Association of Trial Lawyers of America, 228 N.J.Super. 180, 186, 549 A.2d 446 (App.Div.), certif. denied, 113 N.J. 660, 552 A.2d 180 (1988). Here, plaintiff school districts have not suffered any direct injury, the individual taxpayers are capable of bringing suit on their own, and the school districts *1230 are not members of any non-profit organization. Thus, the districts do not have standing to sue on behalf of the taxpayers.
Therefore, the trial judge correctly found the school districts lacked standing to bring this action. However, there are seven individual taxpayers who are plaintiffs in this litigation. Defendants have not challenged the standing of the taxpayers who claim a burden and inequality caused by CEIFA.
The taxpayers assert their own constitutional rights and seek to invalidate CEIFA by arguing that the determination of school funds under CEIFA is unconstitutional. The taxpayers, thus, have a sufficient stake in the matter because an adverse decision will continue the disparate tax the taxpayers must pay. They "will be harmed by an unfavorable decision." In re Charter School Application of Englewood, supra, 320 N.J.Super. at 222, 727 A.2d 15. Furthermore, our liberal application of the standing rules are particularly appropriate in taxpayer suits. Ridgewood Educ. Ass'n v. Ridgewood Bd. of Educ., 284 N.J.Super. 427, 431, 665 A.2d 776 (App.Div.1995). Accordingly, the plaintiff taxpayers residing in middle income school districts have standing to raise the constitutional issues pressed in this litigation. Thus, both because the individual plaintiff taxpayers can press the issues and because of the importance of the issues being raised, we proceed to discuss the merits of the claims.

III.
Plaintiffs appeal from dismissal of their complaint for failure to state a claim under R. 4:6-2(e). We must, therefore, carefully and indulgently search their complaint and accept all of their assertions as true. Then, giving plaintiffs the benefit of all favorable inferences, we decide whether the alleged facts establish a cause of action. Burg v. State, 147 N.J.Super. 316, 319-20, 371 A.2d 308 (App.Div.), certif. denied, 75 N.J. 11, 379 A.2d 242 (1977).
However, we must also be cognizant of the fact that both of plaintiffs' claims challenge CEIFA's constitutionality. CEIFA, like every statute, is presumed valid. In re C.V.S. Pharmacy Wayne, 116 N.J. 490, 497, 561 A.2d 1160 (1989), cert. denied, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990). Plaintiffs must, therefore, carry a heavy burden to establish that CEIFA is unconstitutional. Smith v. Penta, 81 N.J. 65, 74, 405 A.2d 350, appeal dismissed, 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979).
Plaintiffs first contend that CEIFA is unconstitutional because its funding system violates the T & E mandate. T & E mandates that "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, ¶ 1.
Plaintiffs "do not argue in this case that the State must eliminate any reliance on local property taxation. Nor do [they] argue that the financial burden on taxpayers to support public education must be identical Statewide." Rather, plaintiffs allege the funding scheme is counter-equalizing, increases funding disparities, and has no arguable educational or administrative justification. Plaintiffs thus "contend that the framers of our `T & E' clause did not contemplate disparities in tax burden from district to district for the same basic level *1231 of educational services so great as to defy any rational explanation." They argue that "while tax burdens need not be absolutely equal Statewide, the overall tax structure must at least trend toward equalization...."
In Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273, the court reviewed the historical development of the 1875 constitutional amendment that became the T & E mandate in the 1947 Constitution. The Court rejected the argument that T & E mandates statewide equality of tax burdens and interpreted T & E to ensure equal educational opportunity, but not taxpayer equality. The Court said:
[W]e can find no evidence that the amendment of 1875 was concerned with taxpayers and was intended to incorporate a principle that the tax burden must be met by a statewide tax.
...
[I]t cannot be said the 1875 amendments were intended to insure statewide equality among taxpayers. But we do not doubt that an equal educational opportunity for children was precisely in mind. The mandate that there be maintained and supported `a thorough and efficient system of free public schools for the instruction of all children in the State between the ages of five and eighteen years' can have no other import.
[Robinson I, supra, 62 N.J. at 512-13, 303 A.2d 273.]
Plaintiffs attempt to distinguish this case from Robinson I, by asserting that their argument is narrower than the argument made in Robinson I. Plaintiffs do not urge statewide equality of tax burdens, but only substantial equality through a funding system that moves toward equality. Preliminarily, this argument has the look and feel of a proposal that should be made to the Legislature, not to the courts. In addition, in our opinion, the argument is not sufficient to distinguish this case from Robinson I.
The Robinson I Court stated that the T & E clause was not "intended to insure statewide equality among taxpayers." Ibid. We cannot distinguish plaintiffs' position from this statement just because plaintiffs urge a progressive development toward taxpayer equality. The goal sought by plaintiffs is still, according to Robinson I, not encompassed within the T & E constitutional mandate.
Plaintiffs cite no case supporting this argument and our research has found none. Moreover, their argument finds no support in the Abbott cases. Abbott II, for example, pointed out that the poor urban districts were laboring under school tax rates well above the State-wide average. Abbott II, supra, 119 N.J. at 355, 575 A.2d 359. The Court's concern with local tax burden, therefore, was within the context of the poor urban districts' inability to raise taxes to support an adequate educational program.
A number of other states have addressed the issue of tax burdens generated by public school funding systems. However, they are generally distinguishable from plaintiffs' assertions either because the out-of-state cases focus on educational inequities or have constitutional clause verbiage that differs from ours. See e.g., Roosevelt v. Bishop, 179 Ariz. 233, 877 P.2d 806 (1994) (claimed the education financing scheme caused educational disparities and violated Arizona's constitution that required "the establishment and maintenance of a general and uniform public school system ..."); Bismarck Public School Dist. v. State, 511 N.W.2d *1232 247 (N.D.1994) (alleged the education funding distribution failed to equalize tax disparities and resulted in substantial inequities in educational opportunity in violation of the North Dakota constitution requiring the provision of a "uniform system of free public school education throughout the state...."); Idaho Schools for Equal Educational Opportunity v. Evans, 123 Idaho 573, 850 P.2d 724 (1993) (alleged the funding system failed to provide a thorough education in violation of Idaho's constitution that required the Legislature "to establish and maintain a general, uniform and thorough system of public, free common schools."); Rose v. Council for Better Educ., 790 S.W.2d 186 (Ky.1989) (alleged school funding scheme resulted in inadequacies and inequalities violating Kentucky's constitution that required "an efficient system of common schools throughout the state."); Edgewood Independent School Dist. v. Kirby, 777 S.W.2d 391 (Tex.1989) (claimed the public school funding scheme caused "glaring disparities in the ability to raise revenues" violating Texas' constitution requiring the "support and maintenance of an efficient system of public free schools."); Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568 (1989) (alleged the financing scheme caused educational spending and opportunity disparities and violated Wisconsin's constitution requiring "the establishment of district schools, which shall be as nearly uniform as practicable...."); DuPree v. Alma School District, 279 Ark. 340, 651 S.W.2d 90 (1983)(alleged the funding scheme caused a great disparity in funds available for education and violated Arkansas' constitution requiring "a general, suitable and efficient system of free public school...."); Hornbeck v. Somerset, 295 Md. 597, 458 A.2d 758 (1983) (alleged school funding scheme caused inadequate education violating Maryland's constitution that requires "a thorough and efficient system of Free Public Schools...."); Lujan v. Colorado State Bd. of Educ., 649 P.2d 1005 (Colo.1982) (claimed the financing scheme caused varying educational opportunities violating Colorado's constitution that requires "the establishment and maintenance of a thorough and uniform system of free public school throughout the state...."); Bd. of Educ. v. Walter, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979) (claimed unequal expenditures between children of different school districts violated Ohio's constitution that required a "thorough and efficient system of common schools throughout the state."); Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859 (1979) (alleged the financing scheme produced educational inequalities and violated West Virginia's constitution that required "a thorough and efficient system of free schools."); and Marrero v. Commonwealth, 709 A.2d 956 (Pa.Commw.Ct.1998) (alleged the school funding system did not provide the Philadelphia school district with necessary funding to meet its student needs and therefore violated Pennsylvania's constitution that required "the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth.").
The closest case we could find to plaintiffs' position was Skeen v. State, 505 N.W.2d 299 (Minn.1993). In that case, the Minnesota Supreme Court considered a complaint attacking educational financing, despite the fact that plaintiffs conceded they were receiving an adequate education. Id. at 315. Nevertheless, the Court ultimately held that the funding system, while not perfect, withstood constitutional scrutiny under Minnesota's equivalent of our T & E clause and equal protection. Id. at 318.
*1233 Plaintiffs in this case argue that the T & E definition contains room "for courts to hold that a fair and equitable property tax system in support of education is a prerequisite for a thorough and efficient system of education." There is a facile appeal to this argument. But, we can find no out-of-state precedent supporting plaintiffs' argument, and the only in-state precedent is inapposite. Plaintiffs argument should more appropriately be made to the Legislature. We conclude that the T & E constitutional mandate does not protect taxpayers. Because plaintiffs have not asserted any educational disparities, we conclude that Robinson I precludes plaintiffs from maintaining their action based on the T & E constitutional provision.

IV.
Plaintiffs also contend that the range of property tax rates establishes a "present system of school funding [which] is irrational and grossly discriminatory." They point to a range in property tax rates for the 1997/98 school year from .05 per hundred dollars of equalized value in Mantaloking to $7.37 in Audubon Park, and argue that the State's approximately 600 school districts have property tax burdens spread between these two extremes "in a way that makes clear ... that State aid does not meet the [constitutional] requirement... to equalize tax burdens." There is no justification, according to plaintiffs, to annually tax a $200,000 home $100 in one local school district and $14,000 in another.
New Jersey's equal protection clause, N.J. Const. art. I, ¶ 1, provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." This provision prohibits the State from adopting statutory classifications that treat similarly situated people differently. Sanchez v. Dep't of Human Servs., 314 N.J.Super. 11, 30, 713 A.2d 1056 (App.Div.1998).
Robinson I declined to utilize the equal protection clause in resolving the challenge to the then existing educational funding system. The Court believed that such utilization would be "unmanageable." Robinson I, supra, 62 N.J. at 492, 303 A.2d 273. Instead the Court restricted its resolution to the T & E clause.
The Court in Robinson I was unwilling to analyze the problem under equal protection because such an approach could raise questions regarding the delivery of all municipal services. In other words, if inequality in educational services among the various school districts in the State violated equal protection, it was an easy step to argue that so also would be unconstitutional any inequality among municipalities delivering fire, police and other services. The Court refused to mount this slippery slope, and instead turned the case on the T & E clause.
After the Robinson line of cases, the Abbott v. Burke, line of cases (100 N.J. 269, 495 A.2d 376(1985)(Abbott I); 119 N.J. 287, 575 A.2d 359 (1990)(Abbott II); 136 N.J. 444, 643 A.2d 575 (1994)(Abbott III); 149 N.J. 145, 693 A.2d 417 (1997)(Abbott IV); and 153 N.J. 480, 710 A.2d 450 (1998)(Abbott V)), also utilized the T & E clause to the exclusion of equal protection, even though an administrative record was developed, which would have been sufficient to decide Abbott II on equal protection. Abbott I, supra, 100 N.J. at 295-96, 495 A.2d 376. Abbott II recognized the *1234 "monumental governmental upheaval that would result if the equal protection doctrine were held applicable to the financing of education and similarly applied to all governmental services." Abbott II, supra, 119 N.J. at 390, 575 A.2d 359. Therefore, every time our Supreme Court has faced the question, the Court has declined to utilize the equal protection clause.
Plaintiffs attempt in this case to distinguish the current district circumstances from the facts present in Robinson I, where the Court first declined to confront school funding issues under an equal protection analysis. Essentially plaintiffs claim that because "the `home rule' attributes of local school governance were more similar to other branches of municipal government when Robinson was decided, the Court was understandably reluctant to accept the plaintiffs' version of equal protection." Basically, plaintiffs argue that CEIFA's all encompassing State intrusion significantly alters the local districts' abilities to run their school systems. "[O]nly a small portion of the typical school budget can truly be called discretionary," according to plaintiffs. State mandates permeate the educational system. The districts must comply with various curriculum, testing, special programs and other State restrictions. This much State involvement, according to plaintiffs, distinguishes the delivery of educational services from any other municipal service. Furthermore, plaintiffs argue "the State's duty in the area of education stems from the `T & E' clause, a constitutional mandate not applicable to other municipal services."
After careful consideration of plaintiffs' asserted distinctions, we cannot conclude that they are sufficient to permit this case to continue under the equal protection claim, when the last word by our Supreme Court has declared such an inroad to be "unmanageable." The T & E clause was present during Robinson and was an insufficient distinction then to confine any equal protection analysis to the delivery of public education. Can we distinguish on a constitutional basis between the delivery of education to our children, even though protected by its own specific constitutional clause, and the delivery of fire and police protection, for example, for all our citizens including our children?
Much of the now extensive State involvement, argued by plaintiffs, has been spawned by the constitutional litigation in Robinson and Abbott. Thus, some would argue, that the overregulation cited by plaintiffs is required to deliver a T & E educational program to all New Jersey children.
Moreover, the delivery of other municipal services, including police and fire protection also include some State regulation. See e.g., N.J.S.A. 40A:14-7.1 (member of the arson investigation unit must complete a training course approved by the Police Training Commission and Department of Law and Public Safety); N.J.S.A. 52:17B-71 (Police Training Commission, of which the Attorney General is chairperson, prescribes standards for police training schools and certifies police officers who satisfactorily complete the training program); N.J.S.A. 40A:14-128 (term of office for members and officers of police department and force); N.J.S.A. 52:17B-68 (required training of police officers prior to permanent appointment); N.J.S.A. 40A:14-122 (qualifications for members of police department and force); N.J.S.A. 40A:14-127 (age requirements for members or officers of the police department or *1235 force); N.J.S.A. 40A:14-9 (qualifications of fire department members); N.J.S.A. 40A:14-29 (promotion criteria); N.J.S.A. 40A:14-72 to -77 (administration of elections for board members in the fire district); and N.J.S.A. 40A:14-81.2 (qualifications for appointment to a paid position in the fire district).
We do not believe that the difference between extensive State regulation of education and less extensive State regulation of other municipal services is sufficient to confine completely any equal protection analysis to the delivery of educational services. We have unease about pronouncing a willingness to decide the claim on an equal protection basis, and we conclude that we remain bound by Robinson I and reject any attempt to project equal protection into the school funding dispute.
We do point out in passing, however, that, in any event, we have grave doubts about the merits of plaintiffs' equal protection argument. "In assessing equal protection challenges under the State constitution, our courts have rejected the two-tiered analytical framework (strict scrutiny vs. rational basis) used to resolve such challenges under the Fourteenth Amendment." Rutgers Council of AAUP v. Rutgers, 298 N.J.Super. 442, 452, 689 A.2d 828 (App.Div.1997), certif. denied, 153 N.J. 48, 707 A.2d 151 (1998). To analyze such claims here, we utilize "a balancing test: whether there is an appropriate governmental interest that is suitably furthered by the differential treatment." In re Charter School Application of Englewood, supra, 320 N.J.Super. at 237, 727 A.2d 15 (citing Rutgers Council of AAUP, supra, 298 N.J.Super. at 452, 689 A.2d 828). In balancing the interests we look to "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985).
Here, plaintiffs contend that the system has generated widely disparate tax rates. Plaintiffs do not argue that middle income districts are unable to raise sufficient funds to deliver a T & E educational program. Moreover, plaintiffs do not contend that the system fails to compel the richer districts to pay proportionally more than the poorer districts of the total educational costs necessary to fund a T & E program.
It is the Legislature's responsibility to allocate the State's resources. Barone v. Dep't of Human Services, 107 N.J. 355, 370, 526 A.2d 1055 (1987). In the case of delivering educational services, the Legislature's purpose was to make it possible for every school district to provide a T & E education for its students. The classification of districts on the basis of property wealth and aggregate personal income furthers this purpose by allowing the State to deliver greater State aid to the most needy districts.
CEIFA utilizes district property values and average income to generate the local share. Districts that are wealthy in property and income are expected to pay a greater local share so that more State aid can be delivered to the property and income poor districts.
Plaintiffs claim that utilizing average income wealth is irrational, and argue that an extraordinarily wealthy individual moving into a property poor district would not provide that district with any greater ability to pay its increased local share. We first note that both property values and average income go toward generating the local share. Thus, the district's property values will counter to some degree any rise *1236 in average income caused by any extraordinarily wealthy individual taking up residence within the district.
Second, and more significantly, for equal protection purposes, it seems to us that the district's property values and average income are reasonably related to assessing the citizens' ability to pay the district's local share. The differential treatment that has resulted appears to be an appropriate response to generate greater funds, from a not unlimited resource, for the needier school districts.
We see nothing unconstitutional about requiring greater local support for the educational program from districts that appear able to pay more based upon the district's property values and average income. Therefore, were we to consider the merits, we would still have difficulties with plaintiffs' claims, and we cannot conclude that plaintiffs have set forth a viable constitutional challenge based on the equal protection clause.

V.
Finally, we note that the trial judge, while not reaching defendants' argument that plaintiffs failed to exhaust administrative remedies, indicated in her oral decision that the "dismissal" is without prejudice to the transfer of this matter to the Commissioner of the Department of Education. The judge's January 31, 2000 order, however, dismissed the matter "with prejudice." We review judgments or orders and not oral opinions. Credit Bureau Collection Agency v. Lind, 71 N.J.Super. 326, 328, 177 A.2d 36 (App.Div. 1961). However, to eliminate any confusion, we add the following brief discussion concerning the jurisdiction of the Department of Education.
We have found that plaintiffs' complaint fails to state a viable constitutional claim. Accordingly, the complaint must be dismissed with prejudice. There is nothing left for the Commissioner to consider.
The Commissioner has jurisdiction "to hear and determine ... all controversies and disputes arising under the school laws...." N.J.S.A. 18A:6-9. Certainly, this issue concerns CEIFA, one of the school laws. However, the only relief plaintiffs seek is the constitutional invalidation of CEIFA. No administrative agency has jurisdiction to declare a statute unconstitutional. Sanchez v. Dep't of Human Services, supra, 314 N.J.Super. at 32, 713 A.2d 1056; Student Members of Playcrafters v. Bd. of Ed., 177 N.J.Super. 66, 73, 424 A.2d 1192 (App.Div.), aff'd, 88 N.J. 74, 438 A.2d 543 (1981).
Not before or after Abbott I has an administrative agency on its own assumed jurisdiction over a dispute whose sole object was the constitutional invalidation of a statute. In Abbott I, the Court remanded to the Department of Education for the administrative officials to develop a fulsome technical record so the Court could ultimately decide the constitutional issues.
Abbott I also concluded that there were factual issues presented by the dispute that fell within the particular expertise of the Department of Education and, therefore, required administrative determination. Sanchez v. Dep't of Human Servs., supra, 314 N.J.Super. at 32, 713 A.2d 1056; Student Members of Playcrafters v. Bd. of Ed., supra, 177 N.J.Super. at 73, 424 A.2d 1192; Garrow v. Elizabeth Gen. Hosp. and Dispensary, 79 N.J. 549, 561-62, 401 A.2d 533 (1979); Paterson Redevelopment Agency v. Schulman, 78 N.J. 378, 386-87, 396 A.2d 573, cert. denied, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979); *1237 Brunetti v. Borough of New Milford, 68 N.J. 576, 588-89, 350 A.2d 19 (1975). In this case, we have not considered whether there are any factual issues that require administrative resolution because we do not believe plaintiffs have raised any viable constitutional claims.
Therefore, for the reasons explained above, we conclude that plaintiff local school districts do not have standing to bring either T & E or equal protection claims against the State. The plaintiff taxpayers do have standing, but have not set forth viable claims under the T & E or equal protection clauses of the New Jersey Constitution. Thus, we affirm the trial court's dismissal of the complaint with prejudice.
Affirmed.